## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION
www.flsb.uscourts.gov

In re:

CABI DOWNTOWN LLC,[1]

Debtor.

_____/

Case No. 09-21768-BKC-LMI

Chapter 11

### DEBTOR'S EMERGENCY MOTION PURSUANT TO 11 U.S.C. §§ 105(a), 361, 363, AND 364 AND BANKRUPTCY RULE 4001 FOR ENTRY OF INTERIM AND FINAL ORDERS (I) TO OBTAIN SECURED POST-PETITON FINANCING AND (II) AUTHORIZING USE OF CASH COLLATERAL AND GRANTING REPLACEMENT LIENS AND SUPER-PRIORITY CLAIMS

### EXPEDITED HEARING REQUESTED PURSUANT TO LOCAL RULES 9013-1(F) AND (J)

**The above-captioned debtor and debtor-in-possession requests an emergency hearing in this matter to prevent immediate and irreparable harm that would occur if the Debtor does not have immediate access to a new post-petition secured financing facility and the use of cash collateral to fund the continued operation of its business, payroll, and critical expenses in order to preserve and protect the property of its estate (and the pre-petition secured creditor's collateral). As such, the Debtor requests an emergency hearing as authorized by Local Rules 9013-1(F) and (J) in this matter as soon as possible.**

---

[1]     The Debtor's current mailing address is 19950 W. Country Club Dr., Suite 900, Aventura, FL 33180. The last four digits of the Debtor's tax identification number are [0838].

---

**SUMMARY STATEMENT OF RELIEF REQUESTED PURSUANT TO LOCAL RULES**

The Debtor seeks authority to (i) into a secured post-petition financing agreement and (ii) use cash collateral to fund its operating expenses and costs of administration in this Chapter 11 case in accordance with a proposed budget attached hereto and to provide replacement liens, a super-priority claim and certain reporting as described below as adequate protection for the interests in its cash collateral. The Debtor believes that **Bank of America** may assert a valid and perfected security interest in Cash Collateral (as defined herein). The Debtor proposes to grant to Bank of America as adequate protection a replacement lien in sales proceeds, rental income, and Deposits (as defined below) generated post-petition by the Debtor. In addition, in the event the proposed replacement liens prove inadequate, Bank of America shall also be afforded an allowed superpriority administrative claim pursuant to section 507(b) to the extent of any such failure of adequate protection.

---

CABI Downtown, LLC (the "Debtor"), debtor and debtor in possession, by and through undersigned counsel, hereby files this Emergency Motion (the "Motion") for entry of an order, substantially in the form annexed hereto as Exhibit "A": (a) authorizing the Debtor to enter into a secured post-petition financing agreement (the "DIP Credit Agreement") with CABI Holdings, Inc. ("Holdings" or the "DIP Lender") substantially in the form annexed hereto as Exhibit "B" on an interim basis pending a final hearing on the Motion (the "Final Hearing"); (b) authorizing the Debtor to use Cash Collateral (as hereinafter defined) **in accordance with the budget attached hereto as Exhibit "C" (the "Budget")** pursuant to section 363 of title 11 of the United States Code (the "Bankruptcy Code") on an interim basis pending the Final Hearing; (c) granting pre-petition secured party Bank of America, N.A. ("BOA") a super-priority claim, certain liens and other rights pursuant to Sections 361 and 363 of the Bankruptcy Code as adequate protection for the Debtor's use of Cash Collateral; (d) in accordance with Rule 4001(b)(2), (c) and (d)(3) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), scheduling a Final Hearing (or further interim hearing, as the case may be) and approve notice with respect thereto, and (e) authorizing the DIP Credit Agreement, the use of Cash Collateral pursuant to the Budget, and the granting of a super-priority claim and replacement liens in favor of BOA, on a final basis. In support of this Motion, the Debtor states as follows:

2

## JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider this motion (the "Motion") pursuant to 28 U.S.C. §§157 and 1334.

2.     The subject matter of the Motion is a core proceeding pursuant to 28 U.S.C. §157(b).

3.     Venue is proper in this district pursuant to 28 U.S.C. § 1408.

4.     The statutory predicates for the relief sought by the Motion are sections 361 and 363 of the Bankruptcy Code and Bankruptcy Rules 4001(b)(2) and (d)(3).

## BACKGROUND

### A.     General Background

1.     On the Petition Date, the Debtor filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code.

2.     Since the Petition Date, the Debtor has been operating its business as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.     As of the date hereof, no creditors' committee has been appointed or designated in this case.  In addition, no request for the appointment of a trustee or examiner has been made.

4.     The Debtor is a limited liability company organized and existing under the laws of the State of Florida.

5.     The controlling member of the Debtor is CABI Holdings, Inc.  The managers of the Debtor are Elias Amkie Levy, Elias Cababie Daniel, Abraham Cababie Daniel, Rafael Harari Tussie, and Jaime Dayan Tawil.

### B.     Everglades on the Bay

6.      The Debtor is the developer and owner of the luxury residential condominium development known as Everglades on the Bay ("Everglades") in downtown Miami.  Located at 244 Biscayne Boulevard, Everglades contains 849 residential condominium units (the "Condominium Units") in two towers.  Condominium Units range in size from 563 square feet to 4482 square feet and are configured as flats, loft studios, one-bedroom, two-bedroom, three-bedroom, and penthouse units.  The Condominium Units feature a variety of exotic and high-end finishes as well as expansive views of the downtown Miami skyline and Biscayne Bay.

7.      Everglades also contains approximately 60,000 square feet of commercial retail space (the "Retail Space"), which is intended to be developed into a mix of restaurants, upscale retail/service boutiques, and office suites.  Rental spaces within the Retail Space range from 1,000 to 20,000 square feet and front Biscayne Boulevard, Northeast 2nd Street, or Northeast 3rd Street.

8.      Designed as a center of upscale urban living, Everglades includes a 15,000 square foot spa with sauna and steam room, a fitness center, three swimming pools (including a lagoon pool with a bar overlooking the bay), a billiard room, a private residence lounge, and other similar upscale amenities.  The building also offers 24-hour valet service, computerized security-controlled elevators, and a fully-equipped multi-function business center.

9.      As of the date hereof, the Debtor has closed on the sale of 86 units in Everglades.  In addition, the Debtor continues to actively market the remaining Condominium Units.  One of the Debtor's current marketing initiatives is a deferred purchase program (the "Program") that permits a prospective purchaser (each a "Prospective Purchaser") to lease a Condominium Unit with an option to purchase such Condominium Unit.  The Debtor credits all or part of each Prospective Purchaser's monthly lease payments towards the purchase price of the Condominium Unit, depending upon when the option is exercised.  As of the Petition Date, the

Debtor has leased approximately 135 Condominium Units under the Program. The Debtor intends to establish a procedure for the consummation of future sales, both under the Program and otherwise, that maximizes the return to the estate while protecting the interests of all creditors.

**C.      Reasons for Filing**

10.      The Debtor filed Chapter 11 because of (a) the declining real estate market, (b) its inability to reduce condominium prices in response to these changing market conditions, and (c) its inability, due to circumstances beyond the Debtor's control, to renew, repay, or refinance its secured mortgage debt owed to Bank of America, which matured in March 2009. In the past year, potential purchasers of condominiums at Everglades have sought significant purchase price reductions. Because the Debtor's lenders have refused to grant the Debtor relief from minimum lien release price covenants in the operative construction loan agreement, the Debtor has been stymied from generating significantly more closings at realistic market levels. Consequently, many of the purchasers that paid 20% pre-construction deposits have cancelled their purchases rather than pay the prices demanded by the lenders. Had the Debtor been able to reduce purchase prices as market conditions deteriorating, the Debtor believes that it would have been able to repay all or a substantial portion of the construction loan and averted Chapter 11.

## Description of Indebtedness and Cash Collateral

**A.      Bank of America**

11.      On or about May 19, 2003, Bank of America, as administrative agent for itself and other lenders ("BOA") made a loan (the "Loan") to the Debtor in the principal amount of $11,200,000. To secure the loan, the Debtor executed a mortgage (the "Original Mortgage"), dated May 19, 2003, in favor of BOA in the principal amount of $11,200,000, evidenced by a promissory note (the "Original Note") of the same date. The Original Mortgage was recorded on

5

May 22, 2003 in Official Records Book 21274, page 3054 of the Public Records of Miami-Dade County, Florida.

12.     The Debtor subsequently requested and obtained from BOA an additional advance under the Loan in the principal amount of $1,370,000, increasing the total amount of secured indebtedness to $12,570,000.  As evidence of the increased amount of the Loan, the Debtor executed and delivered to BOA an Amended, Renewed and Restated Promissory Note (the "Amended Note"), dated July 7, 2004, in the amount of $12,570,000.  The Amended Note was secured by a First Amendment and Future Advance Agreement to Mortgage, Assignment of Rents and Security Agreement granted by the Debtor in favor of BOA, dated July 7, 2004 (the "Amended Mortgage").  The Amended Mortgage was subsequently recorded August 2, 2004 in Book 22533, Page 3743, of the Official Records of Miami-Dade, Florida.

13.     Section 2.1 of the Original Mortgage provided that it would secure future advances made by BOA to the Debtor, up to and including a total unpaid aggregate balance of $300,000,000, plus interest thereon, plus certain other disbursements made by BOA to the Debtor.  In connection with the construction of Everglades, on November 18, 2005, the Debtor requested certain additional advances to be made under the Loan in an aggregate amount not to exceed $243,430,000.   The Debtor executed the Second Amendment and Restatement of Mortgage, Assignment of Rents, Security Agreement and Fixture Filing, With Future Advance, dated November 18, 2005, (the "Second Amended BOA Mortgage") in favor of BOA, thereby increasing the principal balance of the Loan to $256,000,000.  The Second Amended Mortgage was recorded on December 7, 2005, in Book 24022, Page 4009, of the Official Records of Miami-Dade County.

14.     The Original Mortgage, the Amended Mortgage, and the Second Amended Mortgage collectively constitute a perfected lien and security interest on all the real and personal

property described therein, including, but not limited to, (i) the real property upon which Everglades is located (the "Land"), (ii) any and all structures, buildings, or improvements (the "Improvements") upon the Land, (iii) all fixtures, equipment, systems, furnishings, and other similar tangible property on or affixed to the Land or the Improvements, (iv) the Debtor's interests in the proceeds from the sale of any Condominium Unit, and (v) the rental proceeds arising from the lease of any part of the Everglades development (collectively, the "Mortgaged Property").

15.    BOA filed a Form UCC-1 Financing Statement naming the Debtor as the debtor and BOA as the secured party on December 21, 2005 under CFN 200501446395 with the Florida Secured Transaction Registry.

**B.    The 2006 Promissory Notes**

16.    As evidence of the Loan, the Debtor executed the following Promissory Notes (collectively, the " 2006 Promissory Notes"):

    (a)    Promissory Note dated March 29, 2006 to the order of Bank of America, N.A., in the original principal amount of $50,000,000;

    (b)    Promissory Note dated March 29, 2006 to the order of Wachovia Bank, National Association, in the original principal amount of $40,000,000;

    (c)    Promissory Note dated March 29, 2006 to the order of The Bank of Nova Scotia, in the original principal amount of $30,000,000;

    (d)    Promissory Note dated March 29, 2006 to the order of LaSalle Bank National Association, in the original principal amount of $26,000,000;

    (e)    Promissory Note dated March 29, 2006 to the order of Comerica Bank, in the original principal amount of $10,000,000;

    (f)    Promissory Note dated March 29, 2006 to the order of HSBC Realty Credit Corporation, in the original principal amount of $50,000,000; and

    (g)    Promissory Note dated March 29, 2006 to the order of Norddeutsche Landesbank Luxembourg S.A., in the original principal amount of $50,000,000.

BOA and each of the other lenders listed in paragraph (b) through (g) above are referred to collectively as the "Lenders."  All of the foregoing 2006 Promissory Notes were modified by that certain Agreement Modifying and Extending Note, Mortgage and Other Loan Documents, dated November 18, 2008, and recorded December 16, 2008 in Official Records Book 26687, Page 721, of the Public Records of Miami-Dade County, Florida (the "First Modification"), and that certain Second Agreement Modifying and Extending Note, Mortgage and Other Loan Documents, dated February 18, 2009 (the "Second Modification").

**C.**      **The Construction Agreement, Collateral Documents, and Guaranties**

17.      BOA, the Debtor, Abraham Cababie Daniel, Elias Cababie Daniel, Jacobo Cababie Daniel,[2] and Cabi Control, S.A. de C.V. (now known as Grupo GICSA, S.A. de C.V. ("GICSA")) (collectively, the "Construction Loan Parties"), entered into a Construction Loan Agreement (the "Construction Loan Agreement"), dated as of November 18, 2005.   The Construction Loan Parties amended the Construction Loan Agreement by executing the following amendments and modifications:

　　　　(a)      Amendment to Construction Loan Agreement dated as of February 6, 2006;

　　　　(b)      Second Amendment to Construction Loan Agreement dated as of January 26, 2008;

　　　　(c)      the First Modification (as defined above); and

　　　　(d)      the Second Modification  (as defined above).

18.      On November 18, 2005, the Debtor and certain other parties executed the Collateral Assignment of General Construction Contract, Plans and Specifications, Architect's Agreement, Consulting Agreement, Construction Services Agreement, Threshold Building Affidavit, Subcontracts and Permits in favor of BOA.

---

[2]      The executor of the estate of Jacobo Cababie Daniel, now deceased, is Elias Cababie Daniel.

19.     On November 18, 2005, the Debtor executed a Collateral Assignment of Sales Contracts, Deposits and Escrow Obligations, dated November 18, 2005, and a Collateral Assignment of Condominium Development Rights, dated November 18, 2005, both in favor of BOA.

20.     On November 18, 2005, the Debtor, Abraham Cababie Daniel, Elias Cababie Daniel, and Jacobo Daniel, executed an Environmental Indemnity Agreement, dated November 18, 2005, in favor of BOA.

21.     Abraham Cababie Daniel, Elias Cababie Daniel, Jacobo Cababie Daniel, and GICSA[3] executed personal guaranties in favor of BOA relating to the Loan.

22.     All of the documents relating to the Loan described in paragraphs 11 through 21 are referred to collectively as the "Loan Documents".

23.     As of the Petition Date, BOA has asserted it is owed approximately $209,000,598 in respect of the Loan.  The Debtor's estate may have claims against the Lenders, and the Debtor reserves all rights and claims against the Lenders and nothing herein shall be deemed to prejudice such rights.

**B.     Other Creditors**

24.     In addition to the indebtedness described above, the Debtor owes approximately $34,100,000 in unsecured debt.  Some remaining retainage and other payments are due to contractors and subcontractors, who may have asserted or may be entitled at some point to assert mechanics liens under the Florida Statutes.  However, pursuant to applicable non-bankruptcy law, the Mortgage lien of BOA is superior in priority to the mechanics lien asserted by W.G.

---

[3]  The GICSA Guaranty provides that it shall be governed by the laws of Mexico.

Yates & Sons (the Debtor's former general contractor) and any other subcontractors against Everglades.

25.    As of June 30, 2009, the Debtor has received approximately $86,131,929 in deposits from unit purchasers who have not yet closed on the purchase of their respective units, inclusive of interest earned on such deposits, from which $49,072617.35 has been disbursed, leaving $37,059,311.91 on deposit in escrow with the Debtor's closing agent.

## RELIEF REQUESTED

**A.    Proposed DIP Credit Agreement.**

26.    The Debtor believes that the use of cash collateral may be insufficient to meet the Debtor's liquidity needs during these cases.  Because substantially all of the Debtor's assets are encumbered by liens in favor of BOA, the Debtor could not have obtained financing on an unsecured administrative expense basis under Section 364(b) of the Bankruptcy Code.  Neither would any independent third-party lender provide financing solely with a super-priority claim under Section 364(c)(1) of the Bankruptcy Code and junior liens under Section 364(c)(3) of the Bankruptcy Code.  In today's credit markets, any such lender would have required priming liens on the collateral of the Debtor's pre-petition secured lenders, which potentially would entail difficult and lengthy priming litigation against the pre-petition secured lenders, with expensive adequate protection payments.  Additionally, the Debtor concluded that the DIP Lender, given its relationship to the Debtor, possessed unique knowledge of its business and restructuring needs and could ensure the provision of post-petition financing on the most advantageous terms in the current credit market.  Moreover, it is unlikely in the current credit environment that the Debtor could have obtained financing at all, much less on the terms provided by the DIP Lender.

27.    Therefore, the Debtor concluded in its sound business judgment, and after investigating other sources of financing without success, that the proposal for post-petition financing provided by the DIP Lender was the most favorable under the circumstances and addressed the Debtor's reasonably foreseeable working capital needs.

28.    As a result, the Debtor has entered into the proposed DIP Credit Agreement with Holdings.  The salient terms of the DIP Credit Agreement are as follows:[4]

DIP Lender:  CABI Holdings, Inc.

Borrower:  CABI Downtown, LLC

Maximum Loan Amount:  $2,000,000 (the "Loan")

Maturity Date:   120 days following entry of the Final Order, subject to the occurrence of an earlier event of default under the DIP Credit Agreement.

Purpose:  The proceeds of the Loans shall be used solely by the Borrower to pay the costs and expenses of the administration of the Reorganization Case in accordance with the Budget, and to pay such other obligations as contemplated by this Agreement, ordered by the Bankruptcy Court or required by the Bankruptcy Code or Bankruptcy Rules.

Repayment:  The Loan may be prepaid in whole or in part, without penalty, prior to maturity.

Interest Rate:  LIBOR plus 400 basis points per annum.  Interest accrued on the Loans shall be capitalized on each Interest Payment Date and added to the outstanding principal amount of the Loans, which capitalized interest shall be evidenced by the PIK Interest Note.  The Lender is hereby authorized to endorse on the grid attached to the PIK Interest Note the amount of interest capitalized and evidenced by the PIK Interest Note.

**Security:  The Loan shall be secured by first liens on any unencumbered assets of the Debtor and second or other junior liens on any encumbered assets of the Debtor, subject to the Carve-Out and any replacement liens granted by the Court with respect to cash collateral usage, and exclusive of avoidance actions.  The Loan will not prime any existing liens.**

---

[4]    Capitalized terms used but not defined herein shall have the meanings assigned to them in the DIP Loan.

**Priority:  Pursuant to Sections 364(c)(2) and (c)(4), the Loan shall be secured by either (i) a junior lien on property of the estate that is subject to a lien or (ii) a first priority lien on property of the estate that is not otherwise subject to a lien.**

Carve-Out:  The super-priority claim and liens granted to the DIP Lender and the BOA Adequate Protection Liens and Claims will be subordinate to the following (collectively, the "Carve-Out"): (a) fees pursuant to 28 U.S.C. § 1930(a)(6); (b) fees payable to the clerk of the Bankruptcy Court and any agent thereof; and (c) in the event of a conversion of these Chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code, fees, costs and expenses incurred by a Chapter 7 trustee (the "*Trustee*") and any professionals retained by such trustee (the fees, costs and expenses of the professionals retained by any such trustee, the "*Trustee Fees*"), in an aggregate amount not exceeding $25,000, with all of such Trustee Fees being subject to allowance by order of the Bankruptcy Court (to the extent applicable) and subject to the right of the DIP Lender and any other party-in-interest to object to the allowance of such Trustee Fees in accordance with any applicable Bankruptcy Rule or, if applicable, order of the Bankruptcy Court relating to the approval of the Trustee Fees and objections thereto (the provisions of this subparagraph (c) only, the "*Trustee Professional Fee Carve-Out*"); and (d) fees and expenses of any professionals or court-approved agents of the Debtor (collectively, the "*Professional Fees*") incurred subsequent to the occurrence of an Event of Default (regardless of when such Professional Fees are billed by the professional or agent or allowed by order of the Bankruptcy Court), in an aggregate amount under this subparagraph (e) not in excess of $250,000 plus all unpaid Professional Fees incurred prior to the occurrence of such Event of Default (regardless of when such Professional Fees are billed by the professional or agent or allowed by order of the Bankruptcy Court), all subject to allowance by order of the Bankruptcy Court (to the extent applicable) and subject to the right of the DIP Lender and any other party-in-interest to object to the allowance of Professional Fees in accordance with any applicable Bankruptcy Rule or, if applicable, order of the Bankruptcy Court relating to the approval of Professional Fees and objections.

**Section 506(c) Waiver:  Subject to entry of the Final Order, other than the Carve-Out, the Debtor, for itself and its estate, shall not assert a claim under section 506(c) of the Bankruptcy Code for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lenders upon the DIP Collateral.**

Events of Default:  Standard events of defaults contained in debtor-in-possession financing agreements, including nonpayment, failure to comply with representations, warranties and covenants, conversion or dismissal of the cases, appointment of a trustee or an examiner with enlarged powers, **and granting of super-priority claims and liens that impair the super-priority claim and liens granted to the DIP Lender.**  In addition, the Debtor's failure to obtain entry of the Final Order within thirty (30) days after the Petition Date is also an event of default.

**Modification of Automatic Stay:    Upon the occurrence and during the continuance of an Event of Default, the DIP Lender may exercise its rights and remedies under the DIP Creditor Agreement without further modification of the automatic stay pursuant to Section 362 of the Bankruptcy Code or further application to or order of this Court; other than terminating and accelerating the Loan, the DIP Lender cannot take enforcement actions unless it provides three (3) business days' prior written notice to the Debtor, its counsel, the U.S. Trustee and counsel to any statutory committees appointed in this Chapter 11 case and no order prohibiting such actions is entered during such three (3) business day period.**

Cash Collateral:  A condition precedent to the availability of funds under the DIP Loan will be entry of the Interim Order authorizing the use of Cash Collateral.  An event of default under the DIP Loan will be the failure of the Bankruptcy Court to enter the Final Order authorizing the use of Cash Collateral.

29.    **The Carve-out currently does not include any fees or costs incurred by a committee of unsecured creditors appointed in these cases.  The Debtor and presumably BOA will negotiate with any such committee regarding the Carve-out after one is appointed in these cases.**

30.    The Debtor believes that the terms of the DIP Credit Agreement are fair and reasonable and offer the most favorable financing available for its situation, especially because the DIP Lender is not charging fees for the DIP Credit Agreement.  The economic terms are reasonable in the current credit market.  Most importantly, the DIP Credit Agreement assures that the Debtor will have sufficient access to financing while it works to propose and confirm a chapter 11 plan.

## ARGUMENT

**A.    Approval of the DIP Credit Agreement is Warranted.**

31.    Pursuant to Section 364(c) of the Bankruptcy Code, if a debtor is unable to obtain unsecured credit allowable as an administrative expense under Section 503(b)(1) of the Bankruptcy Code, then the Court, after notice and a hearing, may authorize the debtor to obtain credit or incur debt (a) with priority over any or all administrative expenses of the kind specified

13

in Section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) that is secured by a junior lien on property of the estate that is subject to a lien.  *See* 11 U.S.C. § 364(c).

32.    Bankruptcy Rule 4001(c) governs the procedures for obtaining authorization to obtain post-petition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 15 days after service of the motion.  If the motion so requests, the court may conduct a hearing before such 15 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2).

33.    Bankruptcy Rule 4001(d) provides, in relevant part, that (a) a motion to modify or terminate the automatic stay must be served on any committee appointed pursuant to Section 1102 of the Bankruptcy Code, on the creditors included on the list filed under Bankruptcy Rule 1007(d), and on such other entities as the court may direct, and (b) objections may be filed within 15 days of the mailing of the notice of the motion.  *See* Fed. R. Bankr. P. 4001(d)(1)(C), 4001(d)(2).

34.    The Debtor proposes to obtain financing under the DIP Credit Agreement by providing, inter alia, super-priority claims, security interests, and liens pursuant to Section 364(c) of the Bankruptcy Code.  Based on the current economic conditions, no third-party lender would provide subordinated financing to the Debtor and no party would seek to incur the time and expense to be incurred in a priming fight with BOA.  Under these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085,

1088 (4th Cir. 1986). Rather, a debtor need only demonstrate "by a good faith effort that credit was not available" without the protections of Section 364(c) and (d). *Id.*

35. Moreover, the Debtor believes that entry into the DIP Credit Agreement is an appropriate exercise of its business judgment. Courts routinely defer to the debtor's business judgment, including decisions to incur debt, where, as here, such judgment is not arbitrary, capricious, or contrary to the provisions and policies underlying the Bankruptcy Code. *See  In re Ames Dep't Stores*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (in analyzing the Debtor's request for approval of a post-petition financing agreement, court noted that "[t]he cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) (in authorizing interim financing agreement, court noted that "[b]usiness judgments should be left to the board room and not to this Court"); *see also Trans World Airlines Inc. v. Travelers Int'l AG (In re Trans World Airlines Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that approval of interim loan, receivables facility, and asset-based facility "reflect[ed] sound and prudent business judgment" and was "reasonable under the circumstances and in the best interest of [the debtor] and its creditors"). The Court should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code." *See In re Curlew Valley Assoc.*, 14 B.R. 506, 513-514 (Bankr. D. Utah 1981); *see also In re Ames Dep't Stores*, 115 B.R. at 40. Applying "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten

the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

36.     The Debtor has exercised sound business judgment in determining to enter into, and has satisfied the legal prerequisites for approval of, the DIP Credit Agreement.  The financing under the DIP Credit Agreement provides significant new liquidity to the Debtor and, thus, will enable the Debtor, inter alia, (a) to minimize disruption to the Debtor's business and ongoing operations, (b) preserve and maximize the value of the Debtor's estate for the benefit of all the Debtor's creditors, (c) avoid immediate and irreparable harm to the Debtor, its creditors, its businesses, its employees, and its assets, and (d) to reach confirmation of a Chapter 11 plan and emerge from Chapter 11 as a healthy reorganized company.

37.     The financing provided under the DIP Credit Agreement is the sole means of ensuring the preservation and enhancement of the Debtor's going concern value.  Indeed, without the financing provided for in the DIP Credit Agreement, the Debtor will not be able to meet its operating expenses, will suffer irreparable harm, and its entire reorganization effort will be jeopardized.

38.     Furthermore, the terms and conditions of the DIP Credit Agreement are fair, reasonable, and appropriate.  The purpose of the DIP Credit Agreement is to enable the Debtor to meet its ordinary course business expenses and the professional fees incurred in these cases.  The terms of the DIP Credit Agreement neither (a) tilt the conduct of these cases and prejudice the powers and rights that the Bankruptcy Code confers for the benefit of all creditors, nor (b) prevent motions by parties in interest from being decided on its merits.

39.     Additionally, the Carve-Out is fair, reasonable, and appropriate.  In this regard, the Carve-Out will ensure that the Debtor is able to obtain the assistance of counsel, thereby promoting the collective rights and expectations of parties in interest.  *See In re Ames Dep't*

*Stores*, 115 B.R. at 38 (noting that courts generally insist on "a carve out" for the professional fees of Debtor's counsel, counsel for official committees, and possible trustee's counsel "to preserve the adversary system" and that "[a]bsent such protection, the collective rights and expectations of all parties in interest are sorely prejudiced").

40.     Accordingly, the terms and conditions of the DIP Credit Agreement are fair and reasonable, and the DIP Lender should be accorded the benefits of Section 364(e) of the Bankruptcy Code in respect of the DIP Credit Agreement.

41.     Based upon the foregoing, the Debtor respectfully requests that the Court approve the DIP Credit Agreement in accordance with the terms set forth in the Interim and Final Orders and DIP Credit Agreement.

**B.      The Automatic Stay Should be Modified as set Forth in the DIP Credit Agreement.**

42.     Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition.  To the extent applicable, the automatic stay set forth in Section 362 of the Bankruptcy Code should be modified to the extent necessary to permit the DIP Lender to perform any act authorized or permitted under or by virtue of the Interim Order, the Final Order or the DIP Credit Agreement.  This would include filing or recording any documents to perfect the DIP Liens, if desired by the DIP Lender notwithstanding the automatic perfection proposed to be granted under the Interim Order and the Final Order.  It would also include enforcement rights upon the occurrence of an event of default under the DIP Credit Agreement.

43.     Stay modification provisions of this kind are ordinary and standard features of post-petition debtor in possession financing facilities and, in the Debtor's business judgment, are reasonable under the present circumstances.  Accordingly, the Debtor respectfully requests that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Interim Order and DIP Credit Agreement.

17

**C.      Proposed Use of Cash Collateral and Necessity of Relief Requested**

44.      By this Motion, the Debtor also seeks entry of interim and final orders authorizing its use of Cash Collateral generally in accordance with the Budget attached hereto as Exhibit "C" and for purposes which include (without limitation) the following:

> a.      care, maintenance and preservation of the property of the Debtor's estate;
>
> b.      payment of necessary payroll, brokerage fees, rent, suppliers, utilities, and other business expenses;
>
> c.      marketing of the remaining unsold units; and
>
> d.      other payments necessary to sustain continued business operations.

45.      The Debtor requests authority to use Cash Collateral immediately to pay operating expenses necessary to continue the operation of the Debtor's business and to maintain its estate, to maximize the return on its assets, and to otherwise avoid irreparable harm and injury to its business and its estate.  Absent such authorization, the Debtor will not be able to retain key personnel, insure its property, and otherwise maintain and protect the estate's assets, BOA's collateral, and any prospect of a reorganization benefiting all parties in interest.  The payment of insurance expenses and U.S. Trustee fees are also necessary to avoid potential dismissal or conversion of these Chapter 11 Cases pursuant to Section 1112(b)(4)(C) of the Bankruptcy Code.

46.      Accordingly, to pay these expenses, the Debtor requests that it be authorized to utilize (a) rental income generated from units leased to tenants; and (b) approximately $20,000 in cash held in bank accounts on the Petition Date in its operations pursuant to the Budget and subject to the replacement liens proposed hereunder in favor of BOA.

**D.      Offer of Adequate Protection**

47.      **In exchange for the Debtor's ability to use Cash Collateral in the operation of its business, as adequate** protection**, the Debtor proposes to grant to BOA (solely to the**

extent of the diminution of BOA's interest in the Cash Collateral) a valid and perfected replacement security interest in, and lien on sale proceeds, rental income, and Deposits generated by the Debtor post-petition equal in extent, validity, and priority as the security interest in those items held as of the Petition Date pursuant to the Loan Agreement, the Second Amended BOA Mortgage, and related loan documents (the "**BOA Adequate Protection Liens**").

48.     The Debtor proposes to continue to sell units in the ordinary course of its business free and clear of BOA's mortgage, and proposes to remit to BOA for application to the Loan the net cash proceeds of such sales (after payment of normal and customary closing expenses).  The Debtor will not use any of the amounts deposited into such account pending further order of the Court.

49.     As of June 30, 2009, the amount of the Deposits presently in escrow was approximately $37 million in the aggregate.  To the extent that, as a result of a failure to close or other breach by a potential purchaser of a unit, the Deposits or any portion thereof become property of the Debtor's estate, whether through settlement or court order, the Debtor proposes to pay such Deposits to BOA for application to the Loan.

50.     The Debtor alleges that the interests of BOA will be adequately protected by the BOA Adequate Protection Liens provided hereunder.  As reflected in the Budget, all of the cash to be used will be used to pay the carrying costs of the property.[5]  Consequently, no further

---

[5]     Section 506(a) of the Bankruptcy Code provides that the value of a secured party's interest in property of the estate shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.  The Debtor expressly reserves the right to obtain an appraisal or to dispute the findings, assumptions or conclusions set forth in any appraisal presented by any other party, or otherwise advance an alternative view on the value of BOA's collateral at any time or at any future hearing. The Debtor reserves all rights and claims against the Lenders, and nothing herein shall be deemed to prejudice such rights.

provision for adequate protection is required because the Debtor submits that BOA is undersecured.[6]

51.    **In addition, and solely to the extent that the BOA Adequate Protection Liens proposed herein do not provide BOA with new collateral equal in value to the any diminution in the value of the Cash Collateral, BOA shall be entitled to an allowed, superpriority administrative expense claim under Section 507(b) of the Bankruptcy Code (the "<u>BOA Superpriority Claim</u>" and together with BOA Adequate Protection Liens, the "<u>BOA Adequate Protection Liens and Claims</u>").  The Superpriority Claim shall have priority over all administrative expenses of the kind specified in, or ordered pursuant to, any provision of the Bankruptcy Code, including, without limitation, those specified in, or ordered pursuant to, sections 326, 328, 330, 503(b), 506(c), 507(a), 507(b), 546(c), 726, and 1114 of the Bankruptcy Code, or otherwise (whether incurred in this Chapter 11 case or any conversion thereof to a case under Chapter 7 of the Bankruptcy Code or any other proceeding related hereto or thereto).**

52.    **In addition, the Debtor shall prepare and furnish to BOA a weekly report of receipts, disbursements, and a reconciliation of actual expenditures and disbursements with those set forth in the Budget, on a line-by-line basis showing any variance to the proposed corresponding line item of the Budget (the "<u>Budget Reconciliation</u>"). Such Budget Reconciliation shall be provided to BOA so as actually to be received within three (3) Business Days following the end of each prior week.**

---

[6]    *See United Savings Ass'n of Tex. v. Timbers of Inwood Forest Assoc.*, 484 U.S. 365 (1988) (unsecured creditor is not entitled to payment of post-petition interest or fees).

53.     **Finally, the Debtor shall provide the following information to the BOA:  (i) within four (4) business days after the end of each week, an updated rolling 4-week forecast of cash receipts and disbursements for the Debtor for the next succeeding 4 weeks, substantially in the form of the Budget, provided, that if requested by BOA, the Debtor shall, as soon as reasonably practicable, provide an updated rolling 13-week forecast; and (ii) by no later than the end of each calendar month, a summary of the preceding month's operating results, including, without limitation, a schedule of expenditures.**

54.     If allowed to use Cash Collateral, the Debtor believes that it can stabilize its business operations and maintain going concern values.   Otherwise, the Debtor's business operations will cease and **its** assets will have only liquidation value.

**E.     Approval of the Use of Cash Collateral is Warranted**

55.     The Debtor's use of property of its estate is governed by section 363 of the Bankruptcy Code, which provides in pertinent part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).  A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with section 363 of the Bankruptcy Code.  *See* 11 U.S.C. § 1107(a).

56.     The principal restraint on the use of cash collateral is set forth by Section 363(e), which specifies that, absent consent, the Court shall condition the use of secured property "as is necessary to provide adequate protection of such interest."  Pursuant to Section 363(c)(2) of the Bankruptcy Code, the Court may authorize the Debtor to use cash collateral as long as the

applicable secured creditors consent or, if they object, are adequately protected.  *See In re Delta Resources, Inc.*, 54 F.3d 722 (11th Cir. 1995); *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984); *In re McCormick*, 354 B.R. 246, 251 (Bankr. C.D. Ill. 2006) (providing that use of cash collateral of a secured creditor requires the debtor to have the consent of the secured creditor or, alternatively, the debtor must establish that the secured creditor's interest in the cash collateral is adequately protected.); *In re Senior Care Properties*, *Inc.*, 137 B.R. 527 (Bankr. N.D. Fla. 1992); *In re Lane*, 108 B.R. 6 (Bankr. D. Mass. 1989).

57.    Adequate protection is to be determined on a case-by-case factual analysis.  *See Mbank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985); *see also* S. Rep. No. 95-989, 95th Cong., 2d Sess. 54 (1978).  For example, in *O'Connor*, the court held that "[i]n order to encourage the Debtor's efforts in the formative period prior to the proposal of a reorganization, the court must be flexible in applying the adequate protection standard."  *O'Connor*, 808 F.2d at 1396. (citations omitted). *See also In re Quality Interiors, Inc.*, 127 BR. 391 (Bankr. N.D. Ohio 1991) (holding that the granting of a replacement lien provided adequate protection); *In re 495 Central Park Avenue Corp*., 136 B.R. 626 (Bankr. S.D.N.Y. 1992) (projected property improvements constituted adequate protection when rental income from lease conditioned on improvements would increase value of real estate); *In re Sheehan*, 38 B.R. 859 (Bankr. D.S.D. 1984) (court allowed cash collateral to be used in exchange for replacement lien on crops to be grown with the cash).

58.    Pursuant to Section 361 of the Bankruptcy Code, adequate protection may be provided through periodic cash payments, replacement liens, or other relief constituting the "indubitable equivalent" of the creditor's interest.  *In re Resolution Trust Co. v. Swedeland Development Group. Inc.* (*In re Swedeland Development Group, Inc.*), 16 F.3d 552, 564 (3d Cir. 1994) (*en banc*).  This last possibility is regarded as a "catch all", allowing courts discretion in

fashioning the protection provided to a secured party. *Id.*  Accordingly, a determination of whether there is adequate protection is made on a case by case basis.  *Id.*; *see also Mbank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1397 (10th Cir. 1987).

59.    BOA appears to hold valid, perfected and enforceable prepetition liens as set forth in the Second Amended BOA Mortgage and is therefore entitled to adequate protection to protect it against any diminution in the value of its secured interest in the Cash Collateral.  *See* 11 U.S.C. §§ 363(c)(2)(B) and (e).  The Debtor does not expect any diminution during this case.  To the contrary, the Debtor expects to close additional sales at prices per square foot that will meet or exceed the amount of the due under the Loan Agreement on a per square foot basis.

60.    A secured creditor, however, is not entitled to impose its will on the other parties-in-interest that stand to benefit from the maintenance of the unsold units and the continuation of the Debtor as a going concern.  *See, e.g. In re ProAlert, LLC*, 314 B.R. at 441-45 (recognizing that secured creditors' rights are not absolute and that, upon a finding of adequate protection, cash collateral may be used by a debtor for administrative expenses and professional fees over objection of secured creditor).

61.    As set forth herein, BOA is adequately protected by the Debtor's offer of the BOA Adequate Protection Liens and Claims on the post-petition cash generated by the Debtor through the projected sales of units, as well as through rental income and through the forfeiture of Deposits by any purchasers who fail to close.  As set forth in the Budget, BOA is adequately protected by the projected income that the Debtor will receive during the period covered by the Budget and which income would not sharply reduced if not entirely eliminated absent the use of the Cash Collateral.  Even if the Debtor's cash flow proves insufficient to replace the Cash Collateral that is utilized pursuant to the Budget, it cannot be gainsaid that the uses are intended

23

to preserve the value of BOA's collateral and enhance cash flow through additional rentals under the Program.  Clearly BOA is the primary beneficiary of such efforts at this juncture.

62.     Conversely, if the Debtor is denied the use of the Cash Collateral to maintain its operations and to preserve the value of BOA's collateral, the resulting deterioration of the collateral and loss of critical mass by the Debtor will only diminish BOA's prospects, result in a fire-sale liquidation, and delay or frustrate the ultimate payment of creditors, including BOA. *See Chrysler Credit Corp. v. Ruggiere (In re George Ruggiere Chrysler-Plymouth, Inc.)*, 727 F.2d 1017, 1019 (11th Cir. 1984) (adequacy of protection requires determination of value of interest in collateral and whether a proposed use of cash collateral threatens that value). Accordingly, the proposed uses of Cash Collateral to preserve value adequately protect BOA's interests by enhancing rather than threatening the value of its security interests.

63.     Accordingly, the Debtor believes that the approval of the Motion is in the best interests of the Debtor, its creditors and its estate because it will enable the Debtor to (i) continue the orderly operation of its business and avoid an immediate total shutdown of operations; (ii) meet its obligations for payroll, necessary ordinary course expenditures, and other operating expenses; (iii) honor its obligations under its agreements with purchasers of units and tenants, and (iv) make payments authorized under other Orders entered by this Court, thereby avoiding immediate and irreparable harm to the Debtor's estate.

## INTERIM APPROVAL OF THE MOTION SHOULD BE GRANTED

64.     As set forth above, Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit or use cash collateral may not be commenced earlier than 15 days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable to the Debtor's estate.

65.    There is insufficient time for a final evidentiary hearing pursuant to Bankruptcy Rule 4001(b) and (c) to be held before the Debtor must use the funds available under the DIP Credit Agreement and/or Cash Collateral.  If this Motion is not considered on an expedited basis and if the Debtor is denied the ability to immediately access the DIP Credit Agreement or use Cash Collateral, there will be direct and immediate harm to the continuing operation of the Debtor's business.  In order to continue its business activity in an effort to achieve successful reorganization, the Debtor needs immediate access to the DIP Credit Agreement and to use Cash Collateral in its ordinary business operations.  The inability of the Debtor to meet its ordinary business expenses will require the Debtor to discontinue normal operations which will result in irreparable injury to the Debtor and its chances for reorganization.  Any such discontinuation would also adversely impact upon the value of BOA's collateral by reducing the value of the unsold units and driving away potential rental customers.  Indeed, it is undoubtedly in the best interests of BOA, the Debtor, and all other parties in interest that the Debtor be permitted access to the DIP Credit Agreement and to use its Cash Collateral since such usage will preserve the value of BOA's collateral and preserve the value of the Debtor as a going concern.  In light of the immediate and irreparable harm that will be occasioned upon the Debtor (and upon BOA) were the relief requested herein not immediately granted, Bankruptcy Rule 4001(b)(2) and (c)(2) authorizes this Court to hold an immediate preliminary hearing on this Motion.

## NOTICE

66.    No trustee or examiner has been appointed in this case and no official committees have yet been appointed pursuant to Section 1102 of the Bankruptcy Code.  Notice of this Motion has been given by the Court's CM/ECF Transmission to the U.S. Trustee, by United States first class mail and e-mail transmission and/or hand delivery to counsel for Bank of America, Robert Fracasso, Esq., Shutts & Bowen LLP, 1500 Miami Center, 201 South Biscayne

Boulevard, Miami, FL 33131 and by United States first class mail to all other known creditors of the Debtor. The Debtor submits that, given the emergency nature of the relief requested herein, no other or further notice need be given.

## BASIS FOR EMERGENCY RELIEF

67.    The facts previously set out herein clearly justify an immediate hearing on this Motion. The only significant sources of revenue for the Debtor are the collection of its sale proceeds, recovery of deposits from defaulting purchasers, and rental income. In addition, the Debtor has prepetition payroll obligations due to its employees. If the Debtor cannot use the funds available under the DIP Credit Agreement and/or utilize Cash Collateral, it will have no ability to make payroll or pay other necessary operating expenses, and its business will be greatly harmed. The Debtor has narrowly tailored the relief requested on an emergency basis in order to allow it to survive pending a final cash collateral hearing under Bankruptcy Rule 4001(b)(2).

WHEREFORE, the Debtor respectfully requests that the Court (a) enter an order granting the instant Motion, the proposed form of which is attached hereto as Exhibit "A", authorizing the Debtor to enter into the DIP Credit Agreement and use Cash Collateral on an interim basis in substantial conformity with the Budget, and granting replacement liens to BOA as adequate protection; (b) scheduling a preliminary hearing on the Motion at the earliest possible time; (c) scheduling a final cash collateral hearing in accordance with Bankruptcy Rule 4001(b)(2); (d) authorizing the DIP Credit Agreement, the use of Cash Collateral pursuant to the Budget, and the granting of a super-priority claim and replacement liens in favor of BOA, on a final basis, and (e) granting such other and further relief as the Court deems just and proper.

Dated: August 25, 2009.

Respectfully submitted,

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this court set forth in Local Rule 2090-1(A).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
*Proposed Counsel for the Debtor*
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131
Telephone: (305) 374-7580
Facsimile: (305) 375-7593

By: /s/  /s/ Mindy A. Mora
        Mindy A. Mora
        Fla. Bar No. 678910
        mmora@bilzin.com
        Jason Jones
        Fla. Bar No. 186554
        jjones@bilzin.com
        Jeffrey I. Snyder
        Fla. Bar No. 21281
        jsnyder@bilzin.com

   -and-

        KASOWITZ, BENSON, TORRES
        & FRIEDMAN LLP
        Andrew K. Glenn
        aglenn@kasowitz.com
        Jeffrey R. Gleit
        jgleit@kasowitz.com
        1633 Broadway
        New York, New York  10019
        212-506-1700

EXHIBIT "A"

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
<u>www.flsb.uscourts.gov</u>

In re:

CABI DOWNTOWN LLC,[1]

      Debtor.

_____/

Case No. 09-27168-BKC-LMI

Chapter 11

**[PROPOSED] INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 361, 363, AND 364**
**AND BANKRUPTCY RULE 4001 (I) AUTHORIZING THE DEBTOR (A) TO OBTAIN**
**SECURED POST-PETITON FINANCING AND (B) TO USE CASH COLLATERAL**
<u>**AND TO GRANT REPLACEMENT LIENS AND (II) SCHEDULING FINAL HEARING**</u>

      This cause came on for hearing before the Court on August _____, 2009 at_____ _..m. (the

"<u>Interim Hearing</u>"), upon the *Debtor's Emergency Motion for Entry of Interim and Final Orders*

*Pursuant to 11 U.S.C. §§ 105(a), 361, 363 and 364 and Bankruptcy Rule 4001 for Entry of*

---

[1]     The Debtor's current mailing address is 19950 W. Country Club Dr., Suite 900, Aventura, FL 33180.  The last four digits of the Debtor's tax identification number are [0838].

*Interim and Final Orders (I) To Obtain Secured Post-Petition Financing, and (II) Authorizing Use of Cash Collateral and Granting Replacement Liens and Super-Priority Claims* [Dkt No. XXXXX] (the "Motion").[2]  Pursuant to the Motion, the Debtor seeks entry of an interim order (a) authorizing the Debtor to enter into a secured post-petition financing agreement (the "DIP Credit Agreement") with CABI Holdings, Inc. ("Holdings" or the "DIP Lender") on an interim basis pending a final hearing on the Motion (the "Final Hearing"), (b) authorizing the Debtor to use Cash Collateral (as hereinafter defined) in accordance with the budget attached hereto as Exhibit "A" (the "Budget") pursuant to section 363 of title 11 of the United States Code (the "Bankruptcy Code") on an interim basis pending the Final Hearing, (c) granting pre-petition secured party Bank of America, N.A. ("BOA") a super-priority claim, certain liens, and other rights pursuant to sections 361 and 363 of the Bankruptcy Code as adequate protection for the Debtor's use of Cash Collateral, and (d) in accordance with Rule 4001(b)(2), (c) and (d)(3) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), scheduling a Final Hearing (or further interim hearing, as the case may be) on the relief sought in the Motion on a final basis, and to approve notice with respect thereto

The Court finds that due and sufficient notice of the Motion was provided to: (i) the Office of the United States Trustee for the Southern District of Florida, (ii) BOA, (iii) all other known secured creditors of the Debtor, and (iv) all unsecured creditors of the Debtor, and that no other or further notice is necessary.  The Court considered the Motion, together with the record and the arguments of counsel at the Hearing, and it appearing that good and sufficient cause appears for the approval of the DIP Credit Agreement and the use of Cash Collateral, which is in the best interests of the Debtor and its creditors and essential for the operation of the Debtor's

---

[2] Unless otherwise indicated, capitalized terms used herein shall have the meaning ascribed to such terms in the Motion.

2

business on an interim basis, and being otherwise duly advised in the premises, and for the reasons announced on the record at the Hearing, the Court finds as follows:

A.      On August 18, 2009 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").

B.      This Court has jurisdiction over these proceedings and the parties and property affected hereby pursuant to 28 U.S.C. §1334 and this is a "core" proceeding pursuant to 28 U.S.C. §157.  Venue is proper in this Court pursuant to 28 U.S.C. § 1408.  Notice of the Hearing on the Motion was adequate and appropriate in the current circumstances of this Chapter 11 Case as contemplated by 11 U.S.C. § 102(a) and Fed. R. Bankr. P. 2002, 4001(b)(c) & (d) and 9104.

C.      The Debtor do not have sufficient available sources of capital and financing to carry on the operation of its businesses and the administration of this Chapter 11 case without the DIP Credit Agreement and the use of Cash Collateral.  Moreover, the DIP Credit Agreement is the only financing option available under the circumstances of this case, particularly given the current credit environment.  In the absence of the DIP Credit Agreement and the use of Cash Collateral, serious and irreparable harm to the Debtor and its estate will occur.  The preservation, maintenance and enhancement of the value of the Debtor and its estate are of the utmost significance and importance to the Debtor's ability to restructure its liabilities and reorganize under Chapter 11 for the benefit of its creditors and interest holders.

D.      Financing on a post-petition basis is not otherwise available without the Debtor (i) granting, pursuant to section 364(c)(1) of the Bankruptcy Code, claims having priority over any and all administrative expenses of the kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code, subject to the Carve-Out, and (ii) securing, pursuant to section 364(c)(2) and (3) of the Bankruptcy Code, such indebtedness and obligations with security interests in and liens on all of the Debtor's assets and properties, subject to the Carve-Out.

E.      No trustee, examiner or creditors' committee has been appointed in this Chapter 11 Case.

F.      Based on the record presented to the Court by the Debtor at the Interim Hearing, the DIP Credit Agreement has been negotiated in good faith between the Debtor and the DIP Lender, and any credit extended, guarantees or other types of credit support issued and loans made to the Debtor pursuant to the DIP Credit Agreement shall be deemed to have been extended, issued or made, as the case may be, in good faith as required by, and within the meaning of, section 364(e) of the Bankruptcy Code of the Bankruptcy Code.

G.      Based on the record presented to the Court by the Debtor at the Interim Hearing, the terms of the DIP Credit Agreement appear to be fair and reasonable, reflect the Debtor's exercise of prudent business judgment, consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  Absent the relief granted by this Interim Order, the Debtor's estate will be immediately and irreparably harmed.

H.      The Debtor has requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).  The permission granted herein to enter into the DIP Credit Agreement and obtain funds thereunder is necessary to avoid immediate and irreparable harm to the Debtor.  This Court concludes that entry of this Interim Order is in the best interest of the Debtor's estate and its creditors as its implementation will, *inter alia,* allow for the Debtor to carry out the objectives of the Chapter 11 process.

I.      Based on the record presented to the Court at the Hearing, good, adequate and sufficient cause has been shown to justify the immediate grant of the relief requested in the Motion to avoid irreparable harm to the Debtor's estate.  The terms of the Debtor's use of the Cash Collateral, as more fully set forth herein, are (i) fair and reasonable, and (ii) adequately

protect BOA for such use pending the Final Hearing.  Entry of this Order is in the best interests of the Debtor's estate and all parties in interest in this Chapter 11 Case.

NOW, THEREFORE, IT IS ORDERED:

1.      Motion Granted.  The Motion is GRANTED to the extent set forth below.  Any objections to the relief sought in the Motion that have not been previously resolved or withdrawn are hereby overruled on their merits.  This Order shall constitute findings of fact and conclusions of law, and shall become effective immediately upon its entry.

2.      Status Quo.  It is the intent of the Court, by this Order, to reserve unto all parties, all legal and equitable rights and duties, and to preserve the status quo pending further proceedings.  As a result, any right, objection, factual assertion or legal argument not specifically addressed and ruled upon herein shall remain as it was prior to the entry of this Order pending a Final Hearing.

3.      Execution and Compliance with DIP Credit Agreement.  The Debtor is expressly authorized and empowered to execute, deliver and borrow under the DIP Credit Agreement. Additionally, the Debtor is authorized and directed to comply with and perform all of the terms and conditions of the DIP Credit Agreement and to repay all amounts borrowed with interest in accordance with and subject to the terms and conditions set forth in the DIP Credit Agreement and this Interim Order.  All loans made under the DIP Credit Agreement (the "DIP Loans") and interest thereon and all fees, costs, expenses, indebtedness, obligations and liabilities of the Debtor to the DIP Lender under the DIP Credit Agreement and this Interim Order are hereinafter referred to as the "DIP Obligations."

4.      **Use of DIP Credit Agreement Proceeds.  The Debtor is authorized to use the proceeds of the DIP Loans in the operation of its business and the administration of this**

5

Chapter 11 case, **provided** that the proposed DIP Loans and use of proceeds are consistent with the terms of the DIP Credit Agreement and this Interim Order.

5.      **DIP Super-Priority Claim**. For all DIP Obligations now existing or hereafter arising pursuant to the DIP Credit Agreement, the other DIP Loan Documents and/or this Interim Order, the DIP Lender is granted against the Debtor an allowed super-priority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, which claim shall have priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtor, now in existence or hereafter incurred by the Debtor and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia*, sections 105, 326, 328, 330, 331, 364(c)(1), 503(b), 507(a), 507(b), 546(c) and/or 726 of the Bankruptcy Code (the "**DIP Super-Priority Claim**"); **provided**, **however**, that the DIP Super-Priority Claim shall be subordinate to (a) any super-priority claim in favor of BOA granted by order of the Court with respect to the Debtor's use of the Cash Collateral as set forth below and (b) the Carve-Out.

6.      **DIP Liens**. To secure the prompt payment and performance of any and all DIP Obligations under the DIP Credit Agreement, the other DIP Loan Documents and/or this Interim Order, the DIP Lender shall have, and is granted in accordance with the terms and conditions of the DIP Loan Documents, effective on and after the Petition Date, but subject in all cases to the Carve-Out and excluding avoidance actions under Chapter 5 of the Bankruptcy Code:

    (a)      pursuant to section 364(c)(2) of the Bankruptcy Code, valid, perfected, enforceable and non-avoidable first-priority liens on and security interests in all now owned or hereafter acquired assets and property of the Debtor that are not subject to (i) valid, perfected, enforceable and non-avoidable liens as of

the Petition Date, (ii) valid liens in existence on the Petition Date that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code, or (iii) replacements liens granted by order of the Court with respect to the Debtor's use of the Cash Collateral; and

(b) pursuant to section 364(c)(3) of the Bankruptcy Code, valid, perfected, enforceable and non-avoidable second-priority or other junior liens on and security interests in all now owned or hereafter acquired assets and property of the Debtor that are subject to (i) valid, perfected, enforceable and non-avoidable liens in existence on the Petition Date, (ii) to valid liens in existence on the Petition Date that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code, or (iii) replacements liens granted by order of the Court with respect to the Debtor's use of the cash collateral.

The perfected liens and security interests granted pursuant to this Interim Order and the DIP Loan Documents shall be referred to as the "<u>DIP Liens</u>."

7.      <u>DIP Collateral</u>.  The assets and property subject to the DIP Liens granted in this Interim Order (notwithstanding anything to the contrary in the DIP Loan Documents) include, without limitation, all of the Debtor's right, title and interest in and to all present and future assets and property, real and personal, tangible and intangible, wherever located, whether now or hereafter existing, owned, licensed, leased, consigned, arising or acquired, including but not limited to (but not including avoidance claims and causes of action brought under Chapter 5 of the Bankruptcy Code): (a) accounts, chattel paper, deposit accounts, documents, equipment, general intangibles, instruments, inventory, commercial tort claims, investment property, letter of credit rights, goods (and other property not otherwise described herein), (b) all books and records; (c) all of the Debtor's rights, remedies, powers and privileges under the DIP Credit

Agreement; (d) each account into which assets, investments and property may be deposited or credited and all other reserve or other accounts of the Debtor; and all funds on deposit in any such account, together with all certificates and instruments, if any, from time to time evidencing any such account and funds on deposit and all investments made with such funds, all claims thereunder or in connection therewith, and interest, dividends, moneys, instruments, securities, and other property from time to time received, receivable or otherwise distributed in respect of any or all of the foregoing; (e) all securities, securities accounts, security entitlements, entitlement orders, chattel paper, accounts, instruments and general intangibles (including payment intangibles) related to the foregoing; and (f) all collections, proceeds, supporting obligations and all other products and proceeds (including, without limitation, insurance proceeds) of, all collateral security and guarantees given by any person with respect to, and all books and records describing or used in connection with, all and any of the property described above (collectively, the "*DIP Collateral*").

8.      DIP Lien Perfection.  The DIP Liens granted pursuant to this Interim Order shall constitute valid, enforceable, non-avoidable and duly perfected liens and security interests, and the DIP Lender shall not be required to file, record or serve financing statements, mortgages, notices of lien or similar instruments which otherwise may be required under federal, state or local law in any jurisdiction, or take any action, including taking possession, to validate and perfect such liens and security interests; and the failure by the Debtor to execute and deliver any documentation relating to the DIP Liens shall in no way affect the validity, enforceability, non-avoidability, perfection or priority of the DIP Liens.  If, however, the DIP Lender shall determine to file, record or serve any such financing statements, mortgages, notices of lien or similar instruments, or to otherwise confirm perfection of such DIP Liens, the Debtor is directed to cooperate with and assist in such process.  The stay imposed by section 362(a) of the Bankruptcy

Code is hereby modified to allow the filing and recording of a certified copy of this Interim Order and/or any such financing statements, mortgages, notices of lien or similar instruments, and all such documents shall be deemed to have been filed or recorded at the time of and on the date this Court enters this Interim Order.

9. <u>Professional Fee Limitations</u>.  Notwithstanding anything to the contrary in this Interim Order, neither the proceeds of any DIP Loans nor the Professional Fee Carve-Out, nor the Trustee Professional Fee Carve-Out, shall be used to pay Professional Fees or Trustee Fees to the extent incurred in connection with any of the following:  (a) an assertion or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter seeking any order, judgment, determination or similar relief: (i) challenging the legality, validity, priority, perfection or enforceability of the DIP Obligations, the DIP Super-Priority Claim or the DIP Liens, (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, the DIP Obligations, the DIP Super-Priority Claim or the DIP Liens, or (iii) preventing, hindering or delaying the DIP Lender's assertion or enforcement of any claim, right, lien or security interest or realization upon any DIP Collateral; (b) a request for authorization to obtain post-petition loans or other financial accommodations pursuant to section 364(c) or 364(d) of the Bankruptcy Code other than from the DIP Lender without the prior written consent of the DIP Lender; (c) the commencement or prosecution of any action or proceeding asserting any claims, causes of action or defenses against the DIP Lender or any of the DIP Lender's officers, directors, employees, agents, attorneys, affiliates, assigns or successors; or (d) any act which has or could have the effect of materially and adversely modifying, impairing or compromising the rights and remedies of the DIP Lender under the DIP Loan Documents, this Interim Order or applicable law, or which is contrary, in a manner that is material and adverse to the DIP Lender,

9

to any term or condition set forth in or acknowledged by the DIP Loan Documents or this Interim Order.

10.     _Additional Performance_.  The Debtor is authorized to undertake and perform all acts, and execute, deliver and comply with the terms of such other documents, instruments and agreements, in addition to the DIP Loan Documents, as the DIP Lender may reasonably require, as evidence of and for the protection of the DIP Obligations, or which otherwise may be deemed reasonably necessary by the DIP Lender to effectuate the terms and conditions of this Interim Order and the DIP Loan Documents.

11.     _Modification of DIP Credit Agreement_.  The Debtor and the DIP Lender are hereby authorized to implement, in accordance with the terms of the DIP Credit Agreement, any modifications of the DIP Credit Agreement which are not material and adverse to the Debtor or the interests of any statutory committee appointed in this Chapter 11 case without further order of this Court, _provided_ that promptly thereafter, the Debtor shall provide notice of any such modification to the U.S. Trustee and any statutory committee appointed in this case.

12.     **Modification of Automatic Stay; Remedies upon Occurrence of Event of Default.  Upon the occurrence and during the continuance of an Event of Default under the DIP Loan Documents, and subject to the notice provisions described below, the DIP Lender may exercise and enforce its rights and remedies and take all or any of the following actions, without further modification of the automatic stay pursuant to section 362 of the Bankruptcy Code (which stay is hereby deemed modified and vacated to the extent necessary to permit such exercise and enforcement of such rights and remedies and the taking of such actions) or further application to or order of this Court, to: (a) terminate the DIP Loan and any unfunded commitments under the DIP Credit Agreement and thereafter cease to make DIP Loans to the Debtor; (b) declare the principal of and accrued**

interest, fees and other liabilities constituting the DIP Obligations to be immediately due and payable; (c) set off amounts in accounts maintained with the DIP Lender, or otherwise enforce rights and remedies against any other DIP Collateral; and/or (d) take any other action or exercise any other right or remedy permitted to the DIP Lender under the DIP Loan Documents, this Interim Order or applicable law; <u>provided</u>, <u>however</u>, the DIP Lender may take the actions described in clauses (c) or (d) above only after providing three (3) business days' prior written notice to the Debtor, its counsel, the U.S. Trustee and counsel to any statutory committee appointed in this Chapter 11 case, and <u>provided</u> that no order prohibiting such actions is entered by this Court during such three (3) business day period.  The Debtor waives any right to seek relief under the Bankruptcy Code, including without limitation, under section 105 of the Bankruptcy Code, to the extent any such relief would in any way restrict, impair or adversely affect the rights and remedies of the DIP Lender set forth in this Interim Order and in the DIP Loan Documents, and the exercise and enforcement thereof, <u>provided</u> that such waiver shall not preclude the Debtor from contesting and seeking affirmative relief as to whether an Event of Default has occurred and is then continuing.  The DIP Lender's right to exercise remedies is subject to BOA's rights as first priority pre-petition secured creditor.

13.     <u>Good Faith</u>.  Having been found to be extending credit and making DIP Loans to the Debtor in good faith, the DIP Lender shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any authorization contained herein to obtain credit or incur debt or grant a priority or a lien is vacated, reversed or modified on appeal.

14.     **506(c) Waiver.  Subject to entry of the Final Order, other than the Carve-Out, the Debtor, for themselves and their estates, shall not assert a claim under section**

506(c) of the Bankruptcy Code for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender upon the DIP Collateral.

15. <u>Survival of Order, DIP Liens and DIP Super-Priority Claim</u>.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (a) confirming any plan of reorganization in this Chapter 11 case (and the DIP Obligations shall not be discharged by the entry of any such order or pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtor having hereby waived such discharge); (b) converting the Chapter 11 case to Chapter 7 cases or (c) dismissing the Chapter 11 case; and the terms and provisions of this Interim Order as well as the DIP Super-Priority Claims and DIP Liens granted pursuant to this Interim Order and the DIP Loan Documents shall continue in full force and effect notwithstanding the entry of any such order, and such DIP Super-Priority Claims shall maintain its validity and priority, and the DIP Liens shall maintain its validity, priority and perfected status as provided by this Interim Order until all of the DIP Obligations are indefeasibly paid in full and discharged.  The provisions of this Interim Order and the DIP Loan Documents shall be binding upon all parties-in-interest in this case, including, without limitation, the Debtor, the DIP Lender, any statutory committees, and its respective successors and assigns (including, to the fullest extent permitted by applicable law, any Chapter 7 or Chapter 11 trustee hereinafter appointed or elected for the Debtor's estate, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary hereafter appointed as a legal representative of the Debtor or with respect to the property of the Debtor's estate), and shall inure to the benefit of the Debtor, the DIP Lender, any statutory committees, and its respective successors and assigns; <u>provided</u>, <u>however</u>, that the DIP Lender shall have no obligation to

extend any financing to any Chapter 7 trustee or similar responsible person appointed for the Debtor's estate.

16.    <u>Order not Affected by Modification or Stay</u>.  If any or all of the provisions of this Interim Order are hereafter modified, vacated or stayed (including as a result of the Final Hearing), such modification, vacation or stay shall not affect (a) the validity of any obligation, indebtedness or liability incurred by the Debtor to the DIP Lender prior to the effective date of such modification, vacation or stay or (b) the validity or enforceability of any DIP Liens or DIP Super-Priority Claim authorized or created hereunder or pursuant to the DIP Loan Documents, as applicable.  Notwithstanding any such modification, vacation or stay, any indebtedness, obligations or liabilities incurred by the Debtor to the DIP Lender prior to the effective date of such modification, vacation or stay shall be governed in all respects by the original provisions of this Interim Order; and the DIP Lender shall be entitled to all the rights, remedies, privileges and benefits granted herein with respect to all such indebtedness, obligations and/or liabilities.  No indebtedness, obligation or liability owed by the Debtor to the DIP Lender under this Interim Order or the DIP Loan Documents prior to the effective date of any modification, vacation or stay of this Interim Order can, as a result of any subsequent order in this Chapter 11 case, or in any superseding cases, be subordinated, lose its lien priority or super-priority administrative claim status, or be deprived of the benefit of the status of the DIP Liens and DIP Super-Priority Claims granted to the DIP Lender under this Interim Order and/or the DIP Loan Documents.

17.    <u>Section 551; No Subordination or Pari Passu Liens</u>.  The DIP Liens shall not be (a) subject to or *pari passu* with any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code or (b) subordinated to or made *pari passu* with any other lien or security interest created or granted under sections 364(c) or (d) of the Bankruptcy Code or otherwise.  No claim or lien having a priority superior to or

*pari passu* with the DIP Liens or the DIP Super-Priority Claim granted by this Interim Order shall be granted or allowed in this Chapter 11 case or in a Chapter 7 case to which this Chapter 11 case may be converted, except for any super-priority claim and replacement liens granted by order of the Court with respect to the Debtor's use of the cash collateral of any pre-petition lender.

18.    <u>Non-Waiver of Rights</u>.  The failure or delay by the DIP Lender to seek relief or otherwise exercise its rights and remedies under this Interim Order or any other DIP Loan Documents shall not constitute a waiver of any of the rights of the DIP Lender hereunder, thereunder or otherwise, and any single or partial exercise of such rights and remedies against any party or the DIP Collateral shall not be construed to limit any further exercise of such rights and remedies against any other party or the DIP Collateral.

19.    **BOA Reporting.  During the Cash Collateral Period, the Debtor will furnish to BOA by no later than Thursday of each week a report of receipts, disbursements, and a reconciliation of actual expenditures and disbursements with those set forth in the Budget, on a line-by-line basis showing any variance to the proposed corresponding line item of the Budget (the "<u>Budget Reconciliation</u>") (such weekly period to cover Sunday to Saturday). During the Cash Collateral Period, the Debtor shall provide the following additional information to BOA:  (i) within four (4) business days after the end of each week, an updated rolling 4-week forecast of cash receipts and disbursements for the Debtor for the next succeeding 4 weeks, substantially in the form of the Budget, provided, that if requested by BOA, the Debtor shall, as soon as reasonably practicable, provide an updated rolling 13-week forecast; and (ii) by no later than the end of each calendar month, a summary of the preceding month's operating results, including, without limitation, a schedule of expenditures.**

20.    **BOA Adequate Protections Lien and Claims. In addition to the existing rights and interests of BOA in the Cash Collateral (if any) and for the purpose of providing BOA additional adequate protection for any such interest, BOA is hereby granted, as security, a replacement lien of equal extent, validity, priority, and dignity to its pre-petition liens (if any), which replacement lien shall attach to post-petition collateral.  The Court makes no determination at this time as to the extent, priority, or validity of any security interest held by or the obligations owed to BOA prior to the Petition Date.  To the extent the adequate protection as provided herein is found to be insufficient, BOA shall be afforded a superpriority claim pursuant to Section 507(b) of the Bankruptcy Code solely to the extent of any deficiency (collectively, the "BOA Adequate Protection Liens and Claims")**

21.    Carve-Out.  Subject to the terms and conditions of this paragraph, the DIP Super-Priority Claim, DIP Liens and BOA Adequate Protection Liens and Claims granted pursuant to this Interim Order shall be subordinate to the following (collectively, the "*Carve-Out*"): (a) fees pursuant to 28 U.S.C. § 1930(a)(6); (b) fees payable to the clerk of the Bankruptcy Court and any agent thereof; (c) in the event of a conversion of this Chapter 11 case to cases under Chapter 7 of the Bankruptcy Code, fees, costs and expenses incurred by a Chapter 7 trustee (the "*Trustee*") and any professionals retained by such trustee (the fees, costs and expenses of the professionals retained by any such trustee, the "*Trustee Fees*"), in an aggregate amount not exceeding $25,000, with all of such Trustee Fees being subject to allowance by order of the Bankruptcy Court (to the extent applicable) and subject to the right of the DIP Lender and any other party-in-interest to object to the allowance of such Trustee Fees in accordance with any applicable Bankruptcy Rule or, if applicable, order of the Bankruptcy Court relating to the approval of the Trustee Fees and objections thereto (the provisions of this subparagraph (c) only, the "*Trustee Professional Fee*

15

*Carve-Out*"); and (d) fees and expenses of any professionals or court-approved agents of the Debtor and any statutory committees (collectively, the "*Professional Fees*") incurred subsequent to the occurrence of an Event of Default (regardless of when such Professional Fees are billed by the professional or agent or allowed by order of the Bankruptcy Court), in an aggregate amount under this subparagraph (e) not in excess of $250,000 plus all unpaid Professional Fees incurred prior to the occurrence of such Event of Default (regardless of when such Professional Fees are billed by the professional or agent or allowed by order of the Bankruptcy Court), all of such Professional Fees being subject to allowance by order of the Bankruptcy Court (to the extent applicable) and subject to the right of the DIP Lender and any other party-in-interest to object to the allowance of such Professional Fees in accordance with any applicable Bankruptcy Rule or, if applicable, order of the Bankruptcy Court relating to the approval of the Professional Fees and objections thereto (the provisions of this subparagraph (e) only, the "*Professional Fee Carve-Out*").  Payment of any obligations within the Carve-Out shall not and shall not be deemed to reduce the DIP Obligations and shall not and shall not be deemed to subordinate the DIP Super-Priority Claim, the DIP Liens or the BOA Adequate Protection Liens and Claims to any junior pre-petition or post-petition lien, interest or claim in favor of any other party.  Except as otherwise expressly provided herein, the DIP Lender shall not be responsible for the direct payment or reimbursement of any fees, costs or expenses within the Carve-Out, and nothing in this Interim Order or otherwise shall be construed to obligate the DIP Lender, or render the DIP Lender liable, in any way to pay or reimburse any such fees, costs or expenses, or to guarantee that the Debtor have sufficient funds to pay such fees or reimburse such costs and expenses.

22.    <u>Challenge to BOA Liens and Claims</u>.  Nothing contained herein shall preclude or restrict the Debtor, any creditors' committee that may be appointed, or any subsequently appointed trustee from challenging the validity, extent or priority of any claims, liens or

16

obligations asserted or claimed by BOA, and nothing herein set forth shall waive any claims, rights, or demands which the Debtor, any creditors' committee, or any subsequently appointed trustee possess or may assert against BOA.

23.    <u>Use of Cash Collateral</u>.  Subject to the terms and conditions set forth in this Order, the Debtor is authorized, pursuant to 11 U.S.C. § 363 to use Cash Collateral on an interim basis effective as of August ____, 2009 and continuing through September ____, 2009 (the "<u>Expiration Date</u>") (August ____, 2009 through September ____, 2009 is hereafter referred to as the "<u>Cash Collateral Period</u>"), in accordance with the budget attached hereto as <u>Exhibit 1</u> (the "<u>Budget</u>").  Particular expense items may exceed the amount in the Budget by fifteen percent (15%), so long as the aggregate expenses do not exceed the aggregate amount listed in the Budget for the Cash Collateral Period by more than 10%.  At the Final Hearing (as defined below), the Court will consider the Debtor's request to use Cash Collateral after the Expiration Date.

24.    <u>Final Hearing</u>.  The Court shall conduct a final hearing on the Motion (the "<u>Final Hearing</u>") on September ___, 2009 at ____ ___.m. at the United States Bankruptcy Court, 51 S.W. 1st Avenue, Room 1409, Miami, FL 33130 before the Honorable Laurel M. Isicoff, United States Bankruptcy Judge.

25.    <u>Interim Order Effective Immediately</u>.  The provisions of this Order, and any and all rights, remedies, privileges, and benefits conferred hereunder, shall be effective immediately upon entry of this Order pursuant to Bankruptcy Rules 6004(h) and 7062.

26.    <u>Full Force and Effect</u>. The provisions of this Order shall remain in full force and effect unless modified or vacated by subsequent order of this Court.

27.    <u>Conflicts With Credit Agreement</u>.  To the extent there is a conflict or discrepancy between the terms of this Interim Order and the Credit Agreement, this Interim Order shall govern.

# # #

<u>Submitted by:</u>

Mindy A. Mora
Bilzin Sumberg Baena Price & Axelrod LLP
200 S. Biscayne Boulevard, Suite 2500
Miami, FL 33131
Telephone: (305) 374-7580
Facsimile: (305) 375-7593

<u>Copies to:</u>
Mindy A. Mora
*(Attorney Mora shall upon receipt serve a copy of this Order upon all interested parties and file a certificate of service.)*

EXHIBIT "B"

SECURED SUPER-PRIORITY DEBTOR IN POSSESSION

CREDIT AGREEMENT

THIS SECURED SUPER-PRIORITY DEBTOR IN POSSESSION CREDIT AGREEMENT, dated as of August _____, 2009, between CABI DOWNTOWN, LLC, a Florida limited liability company, as debtor and debtor in possession under chapter 11 of the Bankruptcy Code (as hereinafter defined) (the "Borrower"), and CABI HOLDINGS, INC., a [_____] corporation (the "Lender").

W I T N E S S E T H :

WHEREAS, on August 18, 2009 (the "Petition Date"), the Borrower filed a voluntary petition for relief commencing a reorganization case under chapter 11 of the Bankruptcy Code (as defined herein) with the United States Bankruptcy Court for the Southern District of Florida, Miami Division;

WHEREAS, the Borrower continues to operate its business and manage its property as debtor in possession under sections 1107 and 1108 of the Bankruptcy Code

WHEREAS, an immediate and ongoing need exists for the Borrower to obtain additional funds to continue the operation of its business and, accordingly, the Borrower has requested that CABI Holdings, Inc., as the Lender, provide a secured super-priority debtor in possession credit facility; and

WHEREAS, the Lender is not in the business of making loans, but the Lender is willing to make funds available to the Borrower pursuant to sections 364(c)(1), (c)(2) and (c)(3) of the Bankruptcy Code, but only for the purposes and upon the terms and subject to the conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreement, hereinafter contained, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS AND ACCOUNTING TERMS

Section 1.1    Defined Terms.  As used in this Agreement, the following terms have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Account" has the meaning specified in Article 9 of the UCC.

"Account Debtor" has the meaning specified in Article 9 of the UCC.

"Accounts Receivable" means all rights to payment, whether or not earned by performance, for goods or other property sold, leased, licensed, assigned or otherwise disposed of, or services rendered or to be rendered, including, without limitation, all such rights constituting or evidenced by any Account, Chattel Paper, Instrument, General Intangible or Investment Property, together with all of the Borrower's right, title and interest, if any, in any goods or other property giving rise to such right to payment, including any rights to stoppage in transit, replevin, reclamation and resales, and all related security interests, Liens and pledges, whether voluntary or involuntary, in each case whether now existing or owned or hereafter arising or acquired, and all Collateral Support and Supporting Obligations related to the foregoing and all Accounts Receivable Records.

"Accounts Receivable Records" means (a) all original copies of all documents, instruments or other writings or electronic records or other Records evidencing the Accounts Receivable, (b) all books, correspondence, credit or other files, Records, ledger sheets or cards, invoices, and other papers relating to Accounts Receivable, including, without limitation, all tapes, cards, computer tapes, computer discs, computer runs, record keeping systems and other papers and documents relating to the Accounts Receivable, whether in the possession or under the control of the Borrower or any computer bureau or agent from time to time acting for the Borrower or otherwise, (c) all evidences of the filing of financing statements and the registration of other instruments in connection therewith, and amendments, supplements or other modifications thereto, notices to other creditors or Lender, and certificates, acknowledgments, or other writings, including, without limitation, lien search reports, from filing or other registration officers, (d) all credit information, reports and memoranda relating thereto and (e) all other written, electronic or other non-written forms of information related in any way to the foregoing or any Accounts Receivable.

"Affiliate" means, with respect to any Person, any other Person which, directly or indirectly, controls, is controlled by or is under common control with such Person, each officer, director, general partner or joint venturer of such Person, and each Person who is the beneficial owner of 5% or more of any class of voting Stock of such Person.  For the purposes of this definition, "control" means the possession of the power to direct or cause the direction of management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" means this Secured Super-Priority Debtor In Possession Credit Agreement.

"Bankruptcy Code" means title 11, United State Code, as amended from time to time.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Florida, Miami Division and any other court having competent jurisdiction over the Reorganization Case.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, each as amended from time to time.

"<u>Borrower</u>" has the meaning specified in the recitals to this Agreement.

"<u>Borrowing</u>" means a borrowing consisting of Loans made on the same day.

"<u>Budget</u>" means the projections for the Borrower delivered to Lender in a form and substance satisfactory to Lender in its sole discretion.

"<u>Business Day</u>" means a day of the year on which banks are not required or authorized to close in New York, New York.

"<u>Capital Lease Obligations</u>" means, as to any Person, the capitalized amount of all obligations of such Person or any of its Subsidiaries under any lease of property by such Person as lessee which would be accounted for as a capital lease on a balance sheet of such Person in conformity with GAAP (a "<u>Capital Lease</u>").

"<u>Chattel Paper</u>" has the meaning specified in Article 9 of the UCC.

"<u>Closing Date</u>" means the first date on which all of the conditions precedent specified in <u>Section 3.1</u> are satisfied or waived, but in no event later than _____, 2009.

"<u>Collateral</u>" has the meaning specified in <u>Section 7.1</u>.

"<u>Collateral Support</u>" means all property (real or personal) assigned, hypothecated or otherwise securing any of items <u>(i)</u> through <u>(xxi)</u> in the definition of Collateral set forth in <u>Section 7.1</u> and includes any security agreement or other agreement granting a Lien or security interest in such real or personal property.

"<u>Commitment</u>" means the Commitment set forth in Section 2.1 hereof.

"<u>Contracts</u>" means any and all "contracts", as such term is defined in Article 1 of the UCC, of the Borrower.

"<u>Contractual Obligation</u>" means, with respect to a Person, any obligation, agreement, undertaking or similar provision of any security issued by such Person or of any agreement, undertaking, contract, lease, indenture, mortgage, deed of trust or other instrument (excluding a Loan Document) to which such Person is a party or by which it or any of its property is bound or to which any of its properties is subject.

"<u>Copyrights</u>" means (a) all copyrights arising under the laws of the United States, any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished, all registrations and recordings thereof, and all applications in connection therewith, including all registrations, recordings and applications in the United States Copyright Office or in any foreign counterparts thereof and (b) the right to obtain all renewals thereof.

"<u>Copyright Licenses</u>" means any written agreement naming the Borrower as licensor or licensee granting any right under any Copyright, including the grant of rights to copy,

publicly perform, create derivative works, manufacture, distribute, exploit and sell materials derived from any Copyright.

"<u>Credit Party</u>" means the Borrower and each other Person that grants a security interest in any property to secure the Obligations.

"<u>Default</u>" means any event which with the passing of time or the giving of notice or both would become an Event of Default.

"<u>Documents</u>" has the meaning specified in Article 9 of the UCC.

"<u>Dollars</u>" and the sign "<u>$</u>" each mean the lawful money of the United States of America.

"<u>Domestic Subsidiary</u>" means any Subsidiary of the Borrower that is incorporated within the United States of America.

"<u>Draw Conditions</u>" means all of the conditions precedent to the obligation of the Lender to make Loans set forth in <u>Section 3.1</u>.

"<u>Equipment</u>" has the meaning specified in Article 9 of the UCC.

"<u>Event of Default</u>" means any of the following events:

(a)    The Borrower shall fail to pay any principal of any Loan or any interest on any Loan on the Maturity Date or within five (5) Business Days after the same otherwise becomes due and payable; or

(b)    Any representation or warranty made or deemed made by any Credit Party in any Loan Document shall prove to have been incorrect, false or misleading in any material respect when made or deemed made; or

(c)    Any Credit Party shall fail to perform or observe (i) any term, covenant or agreement contained in Article V or (ii) any material term, covenant or agreement contained in any other Loan Document and, in either case, such failure shall remain unremedied for five (5) Business Days after the earlier of the date on which (A) a Responsible Officer of the Borrower becomes aware of such failure or (B) written notice thereof shall have been given to the Borrower by the Lender; or

(d)    The Reorganization Case shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code or a trustee or examiner shall be appointed in the Reorganization Case; or

(e)    The Final Financing Order is not entered within thirty (30) days after the entry of the Interim Financing Order; or

(f)    The Bankruptcy Court or any court of competent jurisdiction shall have entered an order, which order is a Final Order, amending, supplementing, vacating or otherwise

-4-

modifying the Interim Financing Order or the Final Financing Order without the consent of the Lender; or

(g)      The Borrower shall bring a motion before the Bankruptcy Court to obtain additional financing or incur Indebtedness arising from such additional financing that is secured by a Lien that is equal or senior to any one or more Liens granted hereunder or hereafter granted to the Lender.

(h)      The Borrower shall cease to have the ability to use Cash Collateral.

 "Final Order" means an order of the Bankruptcy Court entered on the docket of the Clerk of the Bankruptcy Court, that is in effect and not stayed, and as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue or rehear shall have been waived, or if an appeal, reargument, petition for certiorari, or rehearing thereof has been sought, the order of the Bankruptcy Court shall have been affirmed by the highest court to which the order was appealed, from which the reargument or rehearing was sought, or certiorari has been denied, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired.

"Final Financing Order" means a Final Order which approves the transactions contemplated by this Agreement on a final basis and is otherwise in form and substance satisfactory to the Lender, as the same may be amended, modified or otherwise supplemented. The Final Financing Order may not be amended or modified in any respect without the prior written consent of the Lender.

"Fiscal Quarter" means each of the three-month periods ending on March 31, June 30, September 30 and December 31.

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board, or in such other statements by such other entity as may be in general use by significant segments of the accounting profession, which are applicable to the circumstances as of the date of determination.

"General Intangible" has the meaning specified in Article 9 of the UCC.

"Goods" has the meaning specified in Article 9 of the UCC.

"Governmental Authority" means any nation, sovereign or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Hedging Contracts" means all interest rate contracts, foreign exchange contracts, currency swap or option agreements, forward contracts, commodity swap, purchase or option agreements, other commodity price hedging arrangements, and all other similar agreements or

arrangements designed to alter the risks of any Person arising from fluctuations in interest rates, currency values or commodity prices.

"Indebtedness" of any Person means without duplication (a) all indebtedness of such Person for borrowed money, all reimbursement and all other obligations with respect to surety bonds, performance bonds, letters of credit and bankers' acceptances, whether or not matured, and all indebtedness for the deferred purchase price of property or services, other than trade payables incurred in the ordinary course of business that are not overdue, (b) all obligations of such Person evidenced by notes, bonds, debentures or similar instruments or which bear interest, (c) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (d) all Capital Lease Obligations of such Person and the present value of future rental payments under all synthetic leases, (e) all obligations of such Person to purchase, redeem, retire, defease or otherwise acquire for value any Stock or Stock equivalents of such Person, valued, in the case of redeemable preferred stock, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, (f) all payments that such Person would have to make in the event of an early termination on the date Indebtedness of such Person is being determined in respect of Hedging Contracts of such Person and (g) all Indebtedness referred to in clause (a), (b), (c), (d), (e) or (f) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including, without limitation, Accounts and General Intangibles) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.

"Initial Borrowing" means the first Borrowing of the Loans.

"Instrument" has the meaning specified in Article 9 of the UCC other than instruments that constitute, or are a part of a group of writings that constitute, Chattel Paper.

"Intellectual Property" means, collectively, all rights, priorities and privileges of the Borrower relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including Copyrights, Copyright Licenses, Patents, Patent Licenses, Trademarks, Trademark Licenses and trade secrets, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Interest Payment Date" means the last Business Day of each Fiscal Quarter during the term of this Agreement.

"Interim Financing Order" means that certain order issued by the Bankruptcy Court pursuant to section 364 and other applicable provisions of the Bankruptcy Code approving this Agreement and the other Loan Documents and the incurrence by the Borrower of the Obligations and the other transactions hereunder, including the granting of the super-priority status, and the security interest and liens, authorizing the use of cash collateral by the Borrower and authorizing the Lender to exercise its rights and remedies hereunder, and which is substantially in the form of Exhibit B and otherwise in form and substance satisfactory to the

Lender.  The Interim Financing Order may not be amended or modified in any respect without the prior written consent of the Lender.

"Inventory" has the meaning specified in Article 9 of the UCC, wherever located.

"Investment Property" means any and all "investment property", as such term is defined in Article 9 of the UCC, of the Borrower, wherever located.

"LIBOR" means the London Inter-Bank Offer Rate for loans of this type determined at the close of business in London on the date of Loans made hereunder.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, lien (statutory or other), security interest or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever intended to assure payment of any Indebtedness or other obligation, including, without limitation, any conditional sale or other title retention agreement, the interest of a lessor under a Capital Lease, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of any financing statement under the UCC or comparable law of any jurisdiction, naming the owner of the asset to which such Lien relates as debtor.

"Loan" means a loan made by the Lender to the Borrower pursuant to Section 2.1 hereof.

"Loan Documents" means, collectively, this Agreement, the Notes and each certificate, agreement or document executed by the Borrower or any other Credit Party and delivered to the Lender.

"Material Adverse Effect" means any change, effect, event or condition that has had or could reasonably be expected to have a material adverse effect on the assets or operations of the Borrower and its Subsidiaries, taken as a whole or that would prevent the Borrower from consummating the transactions contemplated by the Asset Purchase Agreement.

"Maturity Date" means the date that is one-hundred twenty (120) days following the entry of the Final Financing Order.

"Note" means, collectively, the Term Loan Note and the PIK Interest Note.

"Notice of Borrowing" has the meaning specified in Section 2.2(a).

"Obligations" means the Loans and all other advances, debts, liabilities, fees, obligations, covenants and duties of any kind and description, now existing or hereafter arising, whether due or not due, absolute or contingent, liquidated or unliquidated, direct or indirect, express or implied, individually or jointly with others, howsoever evidenced or acquired owing by the Borrower to the Lender, arising under or pursuant to this Agreement or any other Loan Document.

"Partnership" means any partnership in which any Credit Party has an interest.

-7-

"Patents" means (a) all letters patent of the United States, any other country or any political subdivision thereof and all reissues and extensions thereof, (b) all applications for letters patent of the United States or any other country and all divisions, continuations and continuations-in-part thereof, and (c) all rights to obtain any reissues or extensions of the foregoing.

"Patent License" means all agreements, whether written or oral, providing for the grant by or to the Borrower of any right to manufacture, use, import, sell or offer for sale any invention covered in whole or in part by a Patent.

"Payment Intangible" has the meaning specified in Article 9 of the UCC.

"Person" means an individual, partnership, corporation (including, without limitation, a business trust), joint stock company, estate, trust, limited liability company, unincorporated association, joint venture or other entity, or a Governmental Authority.

"Permitted Liens means (a) Liens created pursuant to the Loan Documents and authorized by the Interim Financing Order; (b) purchase money Liens upon or in any property hereinafter acquired by the Borrower in the ordinary course of business to secure the purchase price of such property or to secure Indebtedness incurred solely for the purpose of financing the acquisition of such property, including Liens to secure Capital Lease Obligations; (c) any Lien securing the renewal, extension or refunding of any Indebtedness or other Obligation secured by any Lien permitted by subsection (b) without any increase in the amount secured thereby or in the assets subject to such Lien; (d) Liens arising by operation of law in favor of materialmen, mechanics, warehousemen, carriers, lessors or other similar Persons incurred by the Borrower in the ordinary course of business which secure its obligations to such Person; (e) Liens securing taxes, assessments or governmental charges or levies; (f) Liens incurred or pledges and deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance, old-age pensions and other social security benefits; (g) Liens securing the performance of statutory obligations, surety and appeal bonds and other obligations of like nature, incurred as an incident to and in the ordinary course of business, and judgment liens; (h) zoning restrictions, easements, licenses, reservations, restrictions on the use of real property or minor irregularities incident thereto which do not in the aggregate materially detract from the value or use of the property or assets of the Borrower or impair, in any material manner, the use of such property for the purposes for which such property is held by the Borrower; and (i) valid, perfected and enforceable Liens of record existing immediately prior to the Petition Date.

"Petition Date" has the meaning specified in the recitals hereto.

"PIK Interest Note" means a promissory note of the Borrower, payable to the order of the Lender, substantially in the form of Exhibit A-2, evidencing the aggregate Indebtedness of the Borrower to the Lender resulting from the capitalization of accrued interest payable on the Loans pursuant to Section 2.5(b).

"Proceeds" has the meaning specified in Article 9 of the UCC.

"Real Property" means all of those plots, pieces or parcels of land now owned or hereafter acquired by the Borrower or any of its Subsidiaries (the "Land"), together with the

-8-

right, title and interest of the Borrower, if any, in and to the streets, the land lying in the bed of any streets, roads or avenues, opened or proposed, in front of, the air space and development rights pertaining to the Land and the right to use such air space and development rights, all rights of way, privileges, liberties, tenements, hereditaments and appurtenances belonging or in any way appertaining thereto, all fixtures, all easements now or hereafter benefiting the Land and all royalties and rights appertaining to the use and enjoyment of the Land, including, without limitation, all alley, vault, drainage, mineral, water, oil and gas rights, together with all of the buildings and other improvements now or hereafter erected on the Land, and any fixtures appurtenant thereto.

"<u>Reorganization Case</u>" means the case of the Borrower pursuant to chapter 11 of the Bankruptcy Code pending in the Bankruptcy Court.

"<u>Requirement of Law</u>" means, as to any Person, the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and all federal, state and local laws, roles and regulations, and all orders, judgments, decrees or other determinations of any Governmental Authority or arbitrator, applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"<u>Responsible Officer</u>" means, with respect to any Person, any of the principal executive officers, managing members or general partners of such Person but in any event, with respect to financial matters, the chief financial officer, treasurer or controller of such Person.

"<u>Securities Entitlement</u>" has the meaning specified in Article 8 of the UCC.

"<u>Stock</u>" means shares of capital stock (whether denominated as common stock or preferred stock), beneficial, partnership or membership interests, participations or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity, whether voting or non-voting.

"<u>Subsidiary</u>" means, with respect to any Person, any corporation, partnership or other business entity of which an aggregate of 50% or more of the outstanding Stock having ordinary voting power to elect a majority of the board of directors, managers, trustees or other controlling persons, is, at the time, directly or indirectly, owned or controlled by such Person and/or one or more Subsidiaries of such Person (irrespective of whether, at the time, Stock of any other class or classes of such entity shall have or might have voting power by reason of the happening of any contingency).  As used herein, unless the context requires otherwise, "<u>Subsidiary</u>" means a direct or indirect Subsidiary of the Borrower.

"<u>Supporting Obligations</u>" has the meaning specified in Article 9 of the UCC.

"<u>Taxes</u>" has the meaning specified in <u>Section 2.8(a)</u>.

"<u>Trademarks</u>" means (a) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers, and all goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or

-9-

agency of the United States, any State thereof or any other country or any political subdivision thereof, or otherwise, and all common-law rights related thereto, and (b) the right to obtain all renewals thereof.

"Trademark License" means any agreement, whether written or oral, providing for the grant by or to the Borrower of any right to use any Trademark.

"Term Loan Note" means a promissory note of the Borrower, payable to the order of the Lender in a principal amount equal to the amount of the Commitment as originally in effect, in substantially the form of Exhibit A-1, evidencing the aggregate Indebtedness of the Borrower to the Lender resulting from the Loans made by the Lender.

"UCC" means the Uniform Commercial Code as the same may, from time to time, be in effect in the State of New York.

Section 1.2    Computation of Time Periods.  In this Agreement, in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding" and the word "through" means "to and including."

Section 1.3    Accounting Terms.  All accounting terms not specifically defined herein shall be construed in conformity with GAAP and all accounting determinations required to be made pursuant hereto shall, unless expressly otherwise provided herein, be made in conformity with GAAP.

Section 1.4    Certain Terms.  (a)  The words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole, and not to any particular Article, Section, subsection or clause in this Agreement.

(a)    References herein to an Exhibit, Schedule, Article, Section, subsection or clause refer to the appropriate Exhibit or Schedule to, or Article, Section, subsection or clause in this Agreement.

(b)    Each agreement defined in this Article I shall include all appendices, exhibits and schedules thereto and any references in this Agreement to such agreement shall be to such agreement as so amended, restated, supplemented or modified from time to time.

(c)    References in this Agreement to any statute shall be to such statute as amended or modified and in effect at the time any such reference is operative.

(d)    The term "Lender" includes its respective successors and each permitted assignee of such Lender who becomes a party hereto pursuant to Section 8.14.

(e)    Terms not otherwise defined herein and defined in the UCC are used herein with the meanings specified in the UCC.

ARTICLE II

AMOUNTS AND TERMS OF THE LOANS

Section 2.1    The Loans.  (a)   Subject to the terms and conditions hereof, the Lender agrees to make term loans (each, a "Loan") to the Borrower from time to time on any Business Day during the period from the date of satisfaction or waiver of all of the Draw Conditions until the Maturity Date in an aggregate principal amount not to exceed $2,000,000 (the "Commitment").

(a)    The Loans shall be evidenced by the Term Loan Note.

Section 2.2    Making the Loans.  (a)   Each Loan Borrowing (other than with respect to the Initial Borrowing made hereunder) shall be made on notice, given by the Borrower to the Lender not later than 11:00 A.M. (New York City time) at least one Business Day prior to the date of the proposed Loan Borrowing.  Each such notice (a "Notice of Borrowing") shall be in substantially the form of Exhibit D, which Notice of Borrowing shall specify (i) the date of the requested Borrowing, and (ii) the amount of such Borrowing.

(a)    Each Notice of Borrowing shall be irrevocable and binding on the Borrower.

(c)    Loans will only be made pursuant to a Budget agreed upon by Lender in its sole discretion.

Section 2.3    Repayment.  The Borrower shall repay the entire unpaid principal amount of the Loans and all other outstanding Obligations on the Maturity Date.

Section 2.4    Prepayments.  The Borrower may, upon at least two Business Days' prior notice to the Lender stating the proposed date and aggregate principal amount of the prepayment, prepay the outstanding principal amount of the Loans in whole or in part, together with accrued interest to the date of such prepayment on the principal amount prepaid.  Upon the giving of such notice of prepayment, the principal amount of the Loans specified to be prepaid shall become due and payable on the date specified for such prepayment.  Any such prepayment of a Loan shall result in a permanent reduction in the Commitment.

Section 2.5    Interest.  (a)   All Loans and the outstanding amount of all other Obligations shall bear interest, in the case of Loans, on the unpaid principal amount thereof from the date such Loans are made and, in the case of such other Obligations, from the date such other Obligations are due and payable until, in all cases, paid in full, at a rate equal to LIBOR plus 400 basis points per annum.

(a)    Interest accrued on the Loans shall be capitalized on each Interest Payment Date and added to the outstanding principal amount of the Loans, which capitalized interest shall be evidenced by the PIK Interest Note.  The Lender is hereby authorized to endorse on the grid attached to the PIK Interest Note the amount of interest capitalized and evidenced by the PIK Interest Note.

-11-

Section 2.6    <u>Payments and Computations</u>.  (a)  The Borrower shall make each payment hereunder and under the Notes not later than 1:00 P.M. (New York City time) on the day when due, in Dollars, to the Lender at the address set forth in <u>Section 8.2</u> in immediately available funds without set-off or counterclaim.

(a)    All computations of interest shall be on the basis of a year of 365 days for the actual number of days occurring in the period for which such interest is payable.

(b)    Whenever any payment hereunder or under the Notes shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest.

Section 2.7    <u>Application of Payments</u>.  All payments (including prepayments) on the Loans or any other Obligations other than the capitalization of interest as set forth in <u>Section 2.5(b)</u> shall be made to the Lender for application against the Obligations as follows (regardless of how the Lender may treat such payments for purposes of its own accounting): <u>first</u> to then due interest on any principal amount of Loans prepaid, if any; <u>second</u> to the principal balance of the PIK Interest Note; <u>third</u> to the principal balance of the Loans.

Section 2.8    <u>Taxes</u>.  (a)  Any and all payments by the Borrower under each Loan Document shall be made free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding, in the case of the Lender, taxes measured by its net income, and franchise taxes imposed on it, by the jurisdiction under the laws of which the Lender is organized or any political subdivision thereof (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being hereinafter referred to as "<u>Taxes</u>").  If the Borrower shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder to the Lender (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including, without limitation, deductions applicable to additional sums payable under this <u>Section 2.8</u>) the Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions, (iii) the Borrower shall pay the full amount deducted to the relevant taxing authority or other authority in accordance with applicable law and (iv) the Borrower shall deliver to the Lender evidence of such payment to the relevant taxation or other authority.

(a)    In addition, the Borrower agrees to pay any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies of the United States or any political subdivision thereof or any applicable foreign jurisdiction which arise from any payment made under any Loan Document or from the execution, delivery or registration of, or otherwise with respect to, any Loan Document.

ARTICLE III

CONDITIONS OF LENDING

Section 3.1    <u>Conditions Precedent to Funding of Initial Borrowing</u>.  The obligation of the Lender to fund the Initial Borrowing is subject to the satisfaction of all the following conditions precedent on or before _____, 2009:

(a)    <u>Interim Financing Order and Bankruptcy Court Proceedings</u>.

(i)    The Interim Financing Order shall have been entered by the Bankruptcy Court and any or all provisions of such order shall not have been stayed or vacated.

(b)    <u>Certain Documents</u>.  The Lender shall have received the following documents:

(i)    This Agreement, duly executed and delivered by the Borrower; and

(ii)    The Notes, duly executed and delivered by the Borrower.

Section 3.2    <u>Conditions Precedent to Each Loan</u>.  The obligation of the Lender to make any Loan on any date (including the Closing Date) shall be subject to the satisfaction of all of the following conditions precedent:

(a)    The representations and warranties set forth in Article IV and in the other Loan Documents shall be true and correct on and as of such date as though made on and as of such date other than any such representations and warranties that, by their terms, refer to an earlier date.

(b)    The making of the Loans on such date shall not violate any Requirement of Law and is not subject to any stay or injunction, whether temporary, preliminary or permanent.

(c)    No Default or Event of Default shall have occurred and be continuing

(d)    The Debtor shall have the ability to use Cash Collateral to the reasonable satisfaction of the Lender.

(e)    Each of the Draw Conditions shall have been satisfied or waived by the Lender.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES

To induce the Lender to enter into this Agreement, the Borrower represents and warrants to the Lender that on the Closing Date:

Section 4.1    Corporate Existence; Compliance with Law.  (a) The Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Florida.

(a)    The Borrower (i) is duly qualified or licensed as a foreign limited partnership, limited liability company or corporation, as applicable, in each jurisdiction in which its ownership of properties or the conduct of its business requires such qualification or licensing except for failures to be so qualified or licensed which in the aggregate would not reasonably be expected to have a Material Adverse Effect; (ii) has all requisite limited partnership, limited liability company or corporate power, as applicable, and authority and the legal right to own, pledge, mortgage and operate its properties, to lease the property it operates under lease and to conduct its business as now or currently proposed to be conducted; (iii) is in compliance with its certificate of limited partnership and partnership agreement, certificate of formation of limited liability company and limited liability company agreement, or certificate of incorporation and by-laws, as applicable; and (iv) is in compliance with all other applicable Requirements of Law, except for such noncompliance as in the aggregate would not reasonably be expected to have a Material Adverse Effect and Requirements of Law that are stayed as a result of the commencement of the Reorganization Case.

Section 4.2    Corporate Power; Authorization; Enforceable Obligations.  Except as set forth in Schedule 4.2:

(a)    The execution, delivery and performance by the Borrower of the Loan Documents to which it is a party and the consummation of the transactions related to the financing contemplated hereby:

(i)    are within its limited partnership, limited liability company or corporate powers, as applicable;

(ii)    have been duly authorized by all necessary limited partnership, limited liability company or corporate action, as applicable;

(iii)    do not and will not (A) contravene its respective certificate of limited partnership or partnership agreement, certificate of limited liability company or limited liability company agreement, or certificate of incorporation or by-laws, as applicable, (B) upon entry of the Interim Financing Order by the Bankruptcy Court violate any other applicable or

-14-

enforceable Requirement of Law, or any applicable or enforceable order or decree of any Governmental Authority or arbitrator, (C) result in the breach of, or constitute a default under, or result in or permit the termination or acceleration of, any Contractual Obligation of the Borrower, the effect of which will not be subject to the automatic stay pursuant to section 362 of the Bankruptcy Code or (D) result in the creation or imposition of any Lien upon any of its property other than Liens in favor of the Lender pursuant to the Loan Documents; and

(iv)     do not require the consent of, authorization by, approval of, notice to, acts by or filing or registration with, any Governmental Authority or any other Person, except as otherwise ordered by the Bankruptcy Court or required by the Bankruptcy Code or the Bankruptcy Rules.

(b)     This Agreement has been, and each of the other Loan Documents will have been upon delivery thereof pursuant to <u>Section 3.1</u>, duly executed and delivered for the benefit of or on behalf of each Credit Party party thereto.  This Agreement and the other Loan Documents will be, when delivered pursuant hereto, the legal, valid and binding obligation of such Credit Party, enforceable against it in accordance with its terms and the Interim Financing Order.

Section 4.3     <u>Ownership of Subsidiaries</u>.  As of the Closing Date, Borrower does not have any Subsidiaries.

Section 4.4     <u>Secured, Super-Priority Obligations</u>.  (a) On and after the Closing Date, the provisions of the Loan Documents and the Interim Financing Order are effective to create in favor of the Lender, legal, valid and perfected Liens on and security interests (having the priority provided for herein and in the Interim Financing Order) in all right, title and interest in the Collateral, enforceable against the Borrower.

(a)     All Obligations and all other amounts owing by the Borrower hereunder and under the other Loan Documents in respect thereof will be secured pursuant to section 364(c)(2) of the Bankruptcy Code and the Interim Financing Order, by a first priority perfected security interest in and Lien on, and mortgage against, all of the Collateral and all Proceeds, rents and products of all of the foregoing and all distributions thereon that (i) are unencumbered as of the date hereof or (ii) are not subject to Permitted Liens.

(b)     All Obligations and all other amounts owing by the Borrower hereunder and under the other Loan Documents will be secured pursuant to section 364(c)(3) of the Bankruptcy Code and the Interim Financing Order, by a perfected junior security interest in and Lien on, and mortgage against, all of the Collateral that is subject to the Permitted Liens.

-15-

(c)     Pursuant to section 364(c)(1) of the Bankruptcy Code and the Interim Financing Order, all Obligations and other amounts owing by the Borrower hereunder and under the other Loan Documents in respect thereof at all times will constitute allowed super-priority administrative expense claims in the Reorganization Case having priority over all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code.

Section 4.5     Use of Proceeds.  The proceeds of the Loans shall be used solely by the Borrower to pay the costs and expenses of the administration of the Reorganization Case in accordance with the Budget, and to pay such other obligations as contemplated by this Agreement, ordered by the Bankruptcy Court or required by the Bankruptcy Code or Bankruptcy Rules.

Section 4.6     [Intentionally Left Blank].

## ARTICLE V

## COVENANTS

As long as any of the Obligations or any portion of the Commitment remains outstanding, unless the Lender otherwise consents in writing, the Borrower agrees with the Lender that:

Section 5.1     Compliance with Laws, Etc.  The Borrower shall comply in all material respects with all applicable laws, rules, regulations and orders, except where (a) the failure to comply would not reasonably be expected to have a Material Adverse Effect or (b) compliance is prohibited by, in conflict with, or excused by, the Bankruptcy Code, the Bankruptcy Rules or order of the Bankruptcy Court.

Section 5.2     Maintenance of Existence.  The Borrower shall maintain and preserve, in each case as in effect on the date hereof, its respective existence as a corporation or other form of business organization in good standing, as the case may be, and all material rights, privileges and franchises necessary in the reasonable business judgment of Borrower to the operations of the business of Borrower, except where the failure to do so results solely from the commencement of the Reorganization Case.

Section 5.3     Access.  The Borrower shall, at any reasonable time and from time to time, upon prior reasonable notice, permit the Lender, or any agents or representatives thereof, to (a) examine and make copies of and abstracts from its records and books of account, (b) visit its properties and inspect the Collateral, (c) discuss its affairs, finances and accounts with any of its respective officers or directors and (d) communicate directly with its independent certified public accountants.

Section 5.4     Keeping of Books.  The Borrower shall keep proper books of record and account, in which full and correct entries in all material respects shall be made of all of its financial transactions, assets and business in conformity with GAAP and all Requirements of Law.

Section 5.5     Use of Proceeds.  The Borrower shall use the proceeds of the Loans only as provided in Section 4.5; provided, however, that the Borrower shall not use the proceeds from any Loans for any purpose that is improper under the Bankruptcy Code.

Section 5.6     Further Assurances.  The Borrower shall perform, make, execute and deliver all such additional and further acts, things, deeds, occurrences and instruments as the Lender may reasonably require to document and consummate the transactions contemplated hereby and to vest completely in and ensure the Lender its respective rights under this Agreement, the Notes and the other Loan Documents.

ARTICLE VI

TERMINATION

Section 6.1     Termination; Acceleration.  Upon the occurrence and during the continuation of any Event of Default, without further order of, application to, or action by, the Bankruptcy Court and without limiting any other right or remedy the Lender may by written notice to the Borrower in accordance with Section 8.2 (a) declare that all or any portion of the Commitment be terminated, whereupon the obligation of the Lender to make Loans shall immediately terminate, and (b) declare the Loans, the PIK Interest Note, all accrued interest thereon and all other amounts and Obligations payable under this Agreement to be forthwith due and payable, whereupon the Loans, the PIK Interest Note, all such interest and all such amounts and Obligations shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrower.

Section 6.2     Exercise of Remedies.  Following the Lender's written notice of termination and acceleration given pursuant to Section 6.1, the automatic stay provided in section 362 of the Bankruptcy Code shall be deemed automatically vacated without further action or order of the Bankruptcy Court and the Lender shall be entitled to exercise all of its rights and remedies under the Loan Documents and applicable law, including, without limitation, all rights and remedies with respect to the Collateral.

Section 6.3     Other Termination.  In the event the Draw Conditions (except for the condition set forth in Section 3.1(c)(iii)) have not been met or otherwise waived on or before _____, 2009, either the Lender or the Borrower may, by written notice to each other, terminate this Agreement.  Upon such termination, neither the Lender nor any Credit Party shall have any further obligation hereunder or under any other Loan Document.

ARTICLE VII

SECURITY

Section 7.1     Security.

(a)     To induce the Lender to make the Loans, the Borrower hereby grants to the Lender, as security for the full and prompt payment when due (whether at stated maturity, by acceleration or otherwise) of the Obligations, a continuing first (or junior, as the case may be) priority Lien and security interest (subject only to the Permitted Liens) in accordance with

-17-

sections 364(c)(2) and (3) of the Bankruptcy Code in and to all Collateral of the Borrower.  For purposes of this Agreement, all of the following property now owned or at any time hereafter acquired by the Borrower or in which the Borrower now has or at any time in the future may acquire any right, title or interests is collectively referred to as the "Collateral":

         (i)     All cash and cash equivalents;

         (ii)     all Accounts;

         (iii)     all Accounts Receivable and Accounts Receivable Records;

         (iv)     all books and Records pertaining to the property described in this Section 7.1;

         (v)     all Chattel Paper;

         (vi)     all Documents;

         (vii)     all Equipment;

         (viii)     all General Intangibles, including all Intellectual Property;

         (ix)     all Instruments;

         (x)     all Insurance;

         (xi)     all Inventory;

         (xii)     all Investment Property;

         (xiii)     all other Goods and personal property of the Borrower, whether tangible or intangible, wherever located;

         (xiv)     all Payment Intangibles;

         (xv)     all property of any the Borrower held by the Lender, including all property of every description, in the possession or custody of or in transit to the Lender for any purpose, including safekeeping, collection or pledge, for the account of the Borrower, or as to which the Borrower may have any right or power;

         (xvi)     all Real Property;

         (xvii)   to the extent not otherwise included, all monies and other property of any kind which

is, after the Closing Date, received by the Borrower in connection with refunds with respect to taxes, assessments and governmental charges imposed on the Borrower or any of its property or income;

(xviii) to the extent not otherwise included, all Collateral Support and Supporting Obligations; and

(xix)  to the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of insurance, indemnity, warranty or guaranty payable to the Borrower from time to time with respect to any of the foregoing.

Section 7.2     Perfection of Security Interests.  The Liens and security interests granted herein shall be deemed valid, enforceable and perfected by entry of the Interim Financing Order.  No financing statement, notice of lien, mortgage, deed of trust or similar instrument in any jurisdiction or filing office need be filed or any other action taken in order to validate, perfect, maintain, protect or enforce the Liens and security interests granted by or pursuant to this Agreement and the Interim Financing Order.

Section 7.3     Rights of Lender; Limitations on Lender's Obligations.

(a)     Subject to the Borrower's rights and duties under the Bankruptcy Code (including section 365 of the Bankruptcy Code), it is expressly agreed by the Borrower that, anything herein to the contrary notwithstanding, the Borrower shall remain liable under its Contracts to observe and perform all the conditions and obligations to be observed and performed by it thereunder.  The Lender shall not have any obligation or liability under any Contract by reason of or arising out of this Agreement, the Loan Documents, or the granting to the Lender of a security interest therein or the receipt by the Lender of any payment relating to any Contract pursuant hereto, nor shall the Lender be required or obligated in any manner to perform or fulfill any of the obligations of the Borrower under or pursuant to any Contract, or to make any payment, or to make any inquiry as to the nature or the sufficiency of any payment received by it or the sufficiency of any performance by any party under any Contract, or to present or file any claim, or to take any action to collect or enforce any performance or the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(b)     Subject to Section 7.5, the Lender authorizes the Borrower to collect its Accounts, provided that such collection is performed in accordance with the Borrower's customary procedures, and the Lender may, upon the occurrence and during the continuation of any Event of Default and without notice limit or terminate said authority at any time.

(c)    The Lender may at any time, upon the occurrence and during the continuation of any Event of Default, after first notifying the Borrower of its intention to do so, notify Account Debtors, notify the other parties to the Contracts of the Borrower, notify obligors of Instruments and Investment Property of the Borrower and notify obligors in respect of Chattel Paper of the Borrower that the right, title and interest of the Borrower in and under such Accounts, such Contracts, such Instruments, such Investment Property and such Chattel Paper have been assigned to the Lender and that payments shall be made directly to the Lender. Upon the request of the Lender, the Borrower will so notify such Account Debtors, such parties to Contracts, obligors of such Instruments and Investment Property and obligors in respect of such Chattel Paper.  Upon the occurrence and during the continuation of an Event of Default, the Lender may in its own name, or in the name of others, communicate with such parties to such Accounts, Contracts, Instruments, Investment Property and Chattel Paper to verify with such Persons to the Lender's reasonable satisfaction the existence, amount and terms of any such Accounts, Contracts, Instruments, Investment Property or Chattel Paper.

Section 7.4    Covenants of the Borrower with Respect to Collateral.  The Borrower hereby covenants and agrees with the Lender that from and after the date of this Agreement and until the Obligations are fully satisfied:

(a)    Limitations on Modifications of Accounts.  The Borrower will not, without the Lender's prior written consent, grant any extension of the time of payment of any of the Accounts, Chattel Paper or Instruments, compromise, compound or settle the same for less than the full amount thereof, release, wholly or partly, any Person liable for the payment thereof, or allow any credit or discount whatsoever thereon other than any of the foregoing which are done in the ordinary course of business, consistent with past practices and trade discounts granted in the ordinary course of business of the Borrower.

(b)    Notices.  The Borrower will advise the Lender promptly, in reasonable detail, (i) of any Lien asserted against any of the Collateral other than Permitted Liens, and (ii) of the occurrence of any other event which would result in a material adverse change with respect to the aggregate value of the Collateral or on the security interests created hereunder.

Section 7.5    Performance by Lender of the Borrower' Obligations.  If the Borrower fails to perform or comply with any of its agreements contained herein and the Lender, as provided for by the terms of this Agreement, shall itself perform or comply, or otherwise cause performance or compliance, with such agreement, the expenses of the Lender incurred in connection with such performance or compliance, together with interest thereon at the rate then in effect in respect of the Loan, shall be payable by the Borrower to the Lender on demand and shall constitute Obligations secured by the Collateral.  Performance of the Borrower's obligations as permitted under this Section 7.5 shall in no way constitute a violation of the automatic stay provided by section 362 of the Bankruptcy Code and the Borrower hereby waives applicability thereof.

Section 7.6    Limitation on Lender's Duty in Respect of Collateral.  The Lender shall not have any duty as to any Collateral in its possession or control or in the possession or control of any agent or nominee of it or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto, except that the Lender shall, with

respect to the Collateral in its possession or under its control, deal with such Collateral in the same manner as the Lender deals with similar property for its own account.  Upon request of the Borrower, the Lender shall account for any moneys received by it in respect of any foreclosure on or disposition of the Collateral of the Borrower.

Section 7.7     Remedies, Rights Upon Event of Default.

(a)     If any Event of Default shall occur and be continuing, the Lender may exercise in addition to all other rights and remedies granted to it in this Agreement and in any other Loan Document, all rights and remedies of a secured party under the UCC.  Without limiting the generality of the foregoing, the Borrower expressly agrees that in any such event the Lender, without demand of performance or other demand, advertisement or notice of any kind (except the notice specified below of time and place of public or private sale) to or upon the Borrower or any other Person (all and each of which demands, advertisements and/or notices are hereby expressly waived to the maximum extent permitted by the UCC and other applicable law), may forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give an option or options to purchase, or sell or otherwise dispose of and deliver said Collateral (or contract to do so), or any part thereof, in one or more parcels at public or private sale or sales, at any exchange or broker's board or at any of the Lender's offices or elsewhere at such prices at it may deem best, for cash or on credit or for future delivery without assumption of any credit risk.  The Lender shall have the right upon any such public sale or sales to purchase the whole or any part of said Collateral so sold, free of any right or equity of redemption, which equity of redemption the Borrower hereby releases to the extent permitted by applicable law.  The Borrower further agrees, at the Lender's request, to assemble the Collateral and make it available to the Lender at places which the Lender shall reasonably select, whether at the Borrower's premises or elsewhere.  The Lender shall apply the proceeds of any such collection, recovery, receipt, appropriation, realization or sale (net of all expenses incurred by the Lender in connection therewith, including, without limitation, attorney's fees and expenses), to the Obligations in any order deemed appropriate by the Lender, the Borrower remaining liable for any deficiency remaining unpaid after such application, and only after so paying over such net proceeds and after the payment by the Lender of any other amount required by any provision of law, including, without limitation, the UCC, need the Lender account for the surplus, if any, to the Borrower.  To the maximum extent permitted by applicable law, the Borrower waives all claims, damages, and demands against the Lender arising out of the repossession, retention or sale of the Collateral except such as arise out of the gross negligence or willful misconduct of the Lender.  The Borrower agrees that the Lender need not give more than ten (10) days' notice to the Borrower (which notification shall be deemed given when mailed or delivered on an overnight basis, postage prepaid, addressed to the Borrower at its address set forth in Section 8.2) of the time and place of any public sale of Collateral or of the time after which a private sale may take place and that such notice is reasonable notification of such matters.  The Lender and its agents shall have the right to enter upon any real property owned or leased by the Borrower to exercise any of its rights or remedies under this Agreement.  The Lender shall not be obligated to make any sale of Collateral regardless of notice of sale having been given.  The Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and any such sale may, without further notice, be made at the time and place to which it was adjourned.  The Borrower shall remain liable for any deficiency if the proceeds of any sale or disposition of the

-21-

Collateral are insufficient to pay its Obligations and all other amounts to which the Lender is entitled.

(b)    The Borrower hereby waives  presentment, demand, protest or any notice (to the maximum extent permitted by applicable law) of any kind in connection with this Agreement or any Collateral.

(c)    The DIP Lender's right to exercise remedies is subject to Bank of America's rights as first priority pre-petition secured creditor.

Section 7.8    The Lender's Appointment as Attorney-in-Fact.

(a)    The Borrower hereby irrevocably constitutes and appoints the Lender and any officer or agent thereof, with full power of substitution, as its and its Subsidiaries true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Borrower and in the name of the Borrower, or in its own name, from time to time in the Lender's discretion, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute and deliver any and all documents and instruments which may be necessary and desirable to accomplish the purposes of this Agreement and the transactions contemplated hereby, and, without limiting the generality of the foregoing, hereby gives the Lender the power and right, on behalf of the Borrower, without notice to or assent by the Borrower to do the following:

(i)    to ask, demand, collect, receive and give acquittances and receipts for any and all moneys due and to become due under any Collateral and, in the name of the Borrower, its own name or otherwise, to take possession of and endorse and collect any checks, drafts, notes, acceptances or other Instruments for the payment of moneys due under any Collateral and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Lender for the purpose of collecting any and all such moneys due under any Collateral whenever payable and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Lender for the purpose of collecting any and all such moneys due under any Collateral whenever payable;

(ii)    to pay or discharge taxes, liens, security interests or other encumbrances levied or placed on or threatened against the Collateral, to effect any repairs or any insurance called for by the terms of this Agreement and to pay all or any part of the premiums therefor and the costs thereof; and

(iii)    (A) to direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due and to become due thereunder, directly to the Lender or as the Lender shall direct; (B) to receive payment of and receipt for any and all moneys, claims and other amounts due, and to become due at any time, in respect of or arising out of any Collateral; (C) to sign and indorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications and notices in connection with accounts and other documents constituting or relating to the Collateral; (D) to commence and prosecute any suits, actions or proceedings at law or equity in any court of competent jurisdiction to collect the Collateral or any part thereof and to enforce any other right in respect of any Collateral; (E) to defend any suit, action or proceeding brought against the Borrower with respect to any Collateral of the Borrower; (F) to settle, compromise or adjust any suit, action or proceeding described above and, in connection therewith, to give such discharges or releases as the Lender may deem appropriate; (G) to license or, to the extent permitted by an applicable license, sublicense, whether general, special or otherwise, and whether on an exclusive or non-exclusive basis, any trademarks, throughout the world for such term or terms, on such conditions, and in such manner, as the Lender shall in its sole discretion determine; and (H) generally to sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Lender were the absolute owner thereof for all purposes, and to do, at the Lender's option and the Borrower's expense, at any time, or from time to time, all acts and things which the Lender reasonably deems necessary to protect, preserve or realize upon the Collateral and the Lender's Lien therein, in order to effect the intent of this Agreement, all as fully and effectively as the Borrower might do.

(b)    The Lender agrees that it will forbear from exercising the power of attorney or any rights granted to the Lender pursuant to this Section 7.8, except upon the occurrence or during the continuation of an Event of Default. The Borrower hereby ratifies, to the extent permitted by law, all that said attorneys shall lawfully do or cause to be done by virtue hereof. The power of attorney granted pursuant to this Section 7.8 is a power coupled with an interest and shall be irrevocable until the Obligations are indefeasibly paid in full.

(c)      The powers conferred on the Lender hereunder are solely to protect the Lender's interests in the Collateral and shall not impose any duty upon it to exercise any such powers.  The Lender shall be accountable only for amounts that it actually receives as a result of the exercise of such powers and neither it nor any of its officers, directors, employees or agents shall be responsible to the Borrower for any act or failure to act, except for its own gross negligence or willful misconduct.

(d)      The Borrower also authorizes the Lender, at any time and from time to time upon the occurrence and during the continuation of any Event of Default or as otherwise expressly permitted by this Agreement, (i) to communicate in its own name or the name of its Subsidiaries with any party to any Contract with regard to the assignment of the right, title and interest of the Borrower in and under the Contracts hereunder and other matters relating thereto and (ii) to execute any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral.

## ARTICLE VIII

## MISCELLANEOUS

Section 8.1      Amendments, Etc.  No amendment or waiver of any provision of this Agreement nor consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be in writing and signed by the Lender, and then any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 8.2      Notices, Etc.  Any notice or other communication permitted or required to be given hereunder will be in writing, and sent by reputable courier service (with proof of delivery), by hand delivery or by facsimile (followed by delivery by courier service (with proof of delivery) or by hand delivery), addressed as follows:

If to the Lender:

_____
_____
_____
Attention:  _____
Facsimile number:  _____

With a copy to:

Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York  10019
Attention:  Andrew K, Glenn, Esq.
Facsimile number:   (212) 506-1800

-and-

Bilzin Sumberg Baena Price & Axelrod LLP
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131-5340
Attention:  Mindy Mora, Esq.
Facsimile number:  (305) 351-2242


If to the Borrower:

_____
_____
_____
Attention:  _____
Facsimile number:  _____


With a copy to:

_____
_____
_____
Attention:  _____
Facsimile number:  _____

All such notices and communications shall, when mailed, sent by facsimile, or delivered, be effective when deposited in the mails, or delivered by hand to the addressee or its agent, respectively, except that notices and communications to the Lender pursuant to Article II or VIII shall not be effective until received by the Lender.

Section 8.3    No Waiver; Remedies.  No failure on the part of the Lender to exercise, and no delay in exercising, any right hereunder or under any Note shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 8.4    Costs; Expenses Upon Default.  Upon the occurrence of an Event of Default, the Borrower shall pay all reasonable, documented out-of-pocket expenses (including fees and disbursements of counsel) of the Lender in connection with the preparation and administration of this Agreement or amendment hereof.

Section 8.5    Right of Set-off.  Upon the occurrence and during the continuance of any Event of Default, the Lender, after prompt notice thereof to the Borrower, is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Lender to or for the credit or the account of

the Borrower against any and all of the Obligations now or hereafter existing whether or not the Lender shall have made any demand under this Agreement or any Note or other Loan Document and although such Obligations may be unmatured.

Section 8.6    Binding Effect.  This Agreement shall become effective when it shall have been executed by the Borrower and the Lender and thereafter shall be binding upon and inure to the benefit of the Borrower and the Lender and their respective successors and assigns, subject to Section 8.14.

Section 8.7    Governing Law.  This Agreement and the Notes and the rights and obligations of the parties hereto and thereto shall be governed by, and construed and interpreted in accordance with, the laws of the State of Florida and, to the extent applicable, the Bankruptcy Code.

Section 8.8    Section Titles.  The Section titles contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties hereto.

Section 8.9    Execution in Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

Section 8.10    Entire Agreement.  This Agreement, together with all of the other Loan Documents and all certificates and documents delivered hereunder or thereunder, embodies the entire agreement of the parties and supersedes all prior agreements and understandings relating to the subject matter hereof.

Section 8.11    Confidentiality.  The Lender agrees to keep information obtained by it pursuant hereto and the other Loan Documents confidential in accordance with customary practices and agrees that it will only use such information in connection with the transactions contemplated by this Agreement and not disclose any of such information other than (i) to the Lender's employees, representatives and agents who are or are expected to be involved in the evaluation of such information in connection with the transactions contemplated by this Agreement and who are advised of the confidential nature of such information, (ii) to the extent such information presently is or hereafter becomes available to such Lender on a non-confidential basis from a source other than the Borrower, (iii) to the extent disclosure is required by law, regulation or judicial order or requested or required by bank regulators or auditors or (iv) to assignees or participants or potential assignees or participants who agree to be bound by the provisions of this sentence.

Section 8.12    Jurisdiction.  Any legal action or proceeding with respect to this Agreement or any other Loan Document may be brought in the Bankruptcy Court, and, by execution and delivery of this Agreement, the Borrower hereby accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the Bankruptcy Court.  The parties hereto hereby irrevocably waive any objection, including any objection to the laying of

venue or based on the grounds of forum non conveniens, which any of them may now or hereafter have to the bringing of any such action or proceeding in such respective jurisdictions.

Section 8.13    <u>Waiver of Jury Trial</u>.  Each of the parties hereto irrevocably waives trial by jury in any action or proceeding with respect to this Agreement or any other Loan Document.

Section 8.14    <u>Assignment</u>.  This Agreement and the other Loan Documents shall be binding on and shall inure to the benefit of the parties and their respective successors and assigns, except as otherwise provided herein or therein.  The Borrower may not assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents without the prior express written consent of the Lender.  Any such purported assignment, transfer, hypothecation or other conveyance by the Borrower without the prior express written consent of the Lender shall be void.  The Lender may freely assign, transfer, or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents to any third party.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

Borrower:

CABI DOWNTOWN, LLC
a Debtor and Debtor in Possession


By: _____
        Name:
        Title:  Chief Executive Officer



Lender:

CABI HOLDINGS, INC.


By: _____
        Name:
        Title:

**EXHIBIT A-1**

**FORM OF
TERM NOTE**

U.S. $2,000,000.00                                          Dated: _____, 2009

        FOR VALUE RECEIVED, the undersigned, CABI DOWNTOWN, LLC (the "Borrower"), HEREBY PROMISE TO PAY to the order of CABI HOLDINGS, INC. (the "Lender") the principal sum of Two Million United States Dollars ($2,000,000), or if less, the unpaid principal amount of the Loans (as defined in the Agreement referred to below) of the Lender to the Borrower pursuant to the Commitment (as defined in the Agreement referred to below), payable at such times, and in such amounts, as are specified in the Agreement.

        The Borrower promises to pay interest on the unpaid principal amount hereof from the date when made until such principal amount is paid in full, at such interest rates, and payable at such times, as are specified in the Agreement.  The date and amount of each Loan made by the Lender pursuant to the Commitment and each payment made on account of the principal thereof shall be recorded on Annex A hereto.

        Both principal and interest are payable in lawful money of the United States of America to the Lender in immediately available funds.

        This Note is referred to in, and is entitled to the benefits of, the Secured Super-Priority Debtor in Possession Credit Agreement, dated as of _____, 2009 (as it may be amended or otherwise modified from time to time, the "Agreement"), among the Borrower and the Lender, and the other Loan Documents referred to therein and entered into pursuant thereto.  The Agreement, among other things, (i) provides for the Loans of the Lender in an amount not to exceed the United States Dollar amount first above mentioned, the Indebtedness (as defined in the Agreement) of the Borrower resulting from Loans being evidenced by this Note and (ii) contains provisions for acceleration of the maturity of the unpaid principal amount of this Note upon the happening of certain stated events and also for prepayments on account of the principal hereof prior to the maturity hereof upon the terms and conditions therein specified.

        This Note is secured as provided in the Agreement.

        Except as otherwise provided for in the Agreement and applicable law, the Borrower waives presentment, demand and protest and notice of presentment, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contracts rights, documents, instruments, chattel paper and guaranties at any time held by the Lender on which the Borrower may in any way be liable and hereby ratify and confirm whatever the Lender may do in this regard.

This Note shall be governed by, and construed and interpreted in accordance with, the law of the State of New York.

CABI DOWNTOWN, LLC,
a Debtor and Debtor in Possession


By: _____
Title: Chief Executive Officer

**ANNEX A**

| Date | Amount of Loan | Amount of Principal Paid or Prepaid | Notation Made by |
|------|----------------|-------------------------------------|------------------|

**EXHIBIT A-2**

**FORM OF**

**PIK INTEREST NOTE**

Dated: _____, 2009

FOR VALUE RECEIVED, the undersigned, CABI DOWNTOWN, LLC (the "Borrower"), HEREBY PROMISE TO PAY to the order of CABI HOLDINGS, INC. (the "Lender") the principal amount equal to the amount of accrued interest on the Loans (as defined in the Agreement referred to below) capitalized in accordance with Section 2.5(b) of the Agreement and evidenced by this Note.  The Lender is hereby authorized to endorse on Annex A hereto the amounts of interest capitalized in accordance with Section 2.5(b) of the Agreement.  Any such endorsement shall be conclusive and binding in the absence of manifest error.

Interest on the unpaid principal amount hereof shall be capitalized pursuant to Section 2.5(b) of the Agreement until such principal amount is paid in full, at such interest rates, and payable at such times, as are specified in the Agreement

Payments hereunder shall be in lawful money of the United States of America to the Lender in immediately available funds.

This Note is the PIK Interest Note referred to in, and is entitled to the benefits of, the Secured Super-Priority Debtor in Possession Credit Agreement, dated as of _____, 2009 (as it may be amended or otherwise modified from time to time, the "Agreement"), among the Borrower and the Lender, and the other Loan Documents referred to therein and entered into pursuant thereto.  The Agreement, among other things, (i) provides for the aggregate Indebtedness of the Borrower to the Lender resulting from the capitalization of accrued interest payable on the Loans being evidenced by this Note and (ii) contains provisions for acceleration of the maturity of the unpaid principal amount of this Note upon the happening of certain stated events and also for prepayments on account of the principal hereof prior to the maturity hereof upon the terms and conditions therein specified.

This Note is secured as provided in the Agreement.

Except as otherwise provided for in the Agreement and applicable law, the Borrower waives presentment, demand and protest and notice of presentment, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contracts rights, documents, instruments, chattel paper and guaranties at any time held by the Lender on which the Borrower may in any way be liable and hereby ratify and confirm whatever the Lender may do in this regard.

This Note shall be governed by, and construed and interpreted in accordance with, the law of the State of New York.

CABI DOWNTOWN, LLC,
a Debtor and Debtor in Possession


By: _____
Title: Chief Executive Officer

**ANNEX A**

| Date | Amount of Interest Capitalized | Notation Made by |
| --- | --- | --- |

**EXHIBIT B**

**FORM OF**

**INTERIM FINANCING ORDER**

**EXHIBIT C**


**FORM OF**

**NOTICE OF BORROWING**

[Lender Addresses]

[Date]

Ladies and Gentlemen:

The undersigned, CABI DOWNTOWN, LLC (the "Borrower"), refers to the Secured Super-Priority Debtor in Possession Credit Agreement, dated as of _____, 2009, among the Borrower and the Lender (as it may be amended or otherwise modified from time to time, the "Agreement"; and capitalized terms not defined herein but defined therein being used herein as therein defined), and hereby gives you notice, irrevocably, pursuant to Section 2.2 of the Agreement that the undersigned hereby request a Borrowing under the Agreement, and in that connection sets forth below the information relating to such Borrowing (the "Proposed Borrowing") as required by Section 2.2 of the Agreement:

(i)    The Business Day of the Proposed Borrowing is _____, 200__.

(ii)    The aggregate amount of the Loans constituting the Proposed Borrowing is $_____.

The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the date of the Proposed Borrowing, before and after giving effect thereto and to the application of the proceeds therefrom:

(A)    the representations and warranties contained in the Agreement and in each of the other Loan Documents are true and correct as though made on and as of such date;

(B)    no Default or Event of Default will result from the Proposed Borrowing;

(C)  The making of the Loans on the date of the Proposed Borrowing shall not violate any Requirement of Law and is not subject to any stay or injunction, whether temporary, preliminary or permanent; and

(D) No Event of Default shall have occurred and be continuing.


Very truly yours,

CABI DOWNTOWN, LLC

as Borrower

By:

Title:

Ex.D-2

SCHEDULES


EXHIBITS

Exhibit A-1          - Form of Term Loan Note
Exhibit A-2          - Form of Term PIK Interest Note
Exhibit B            - Form of Interim Financing Order
Exhibit C            - Form of Notice of Borrowing

EXHIBIT "C"

**CABI Downtown, LLC**

**Weekly Cashflow Forecast**

| Week # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week ended | Fri | Fri | Fri | Fri | Fri | Fri | Fri | Fri | Fri | Fri | Fri | Fri | Fri |
| | 8/21/09 | 8/28/09 | 9/4/09 | 9/11/09 | 9/18/09 | 9/25/09 | 10/2/09 | 10/9/09 | 10/16/09 | 10/23/09 | 10/30/09 | 11/6/09 | 11/13/09 |
| **Receipts:** | | | | | | | | | | | | | |
| Leasing Receipts - Retail | - | - | 41,463 | - | - | - | - | 41,463 | - | - | - | 41,463 | - |
| Leasing Receipts - Residential | - | - | 87,181 | 87,181 | - | - | - | 103,326 | 103,326 | - | - | 119,470 | 119,470 |
| Sponsor Liquidity Facility | | | 25,000 | 25,000 | 125,000 | 150,000 | 125,000 | | 25,000 | 100,000 | 325,000 | - | |
| **Total Receipts** | - | - | 153,644 | 112,181 | 125,000 | 150,000 | 125,000 | 144,788 | 128,326 | 100,000 | 325,000 | 160,933 | 119,470 |
| **Disbursements:** | | | | | | | | | | | | | |
| Payroll, Taxes & Benefits | | | 13,800 | | 13,800 | | 13,800 | | 13,800 | | 13,800 | | 13,800 |
| Leasing Commissions - Residential | | | 19,577 | | | | | 40,786 | | | 40,786 | | |
| Condominium Assoc Deficit Funding | | | 91,725 | 91,725 | 91,725 | 91,725 | 91,725 | 91,725 | 91,725 | 91,725 | 91,725 | 91,725 | 91,725 |
| Punch List Contractors | | | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 |
| Refresh Rental Units | | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Marketing & Advertising | | | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Utility Deposits | | | | | | 5,000 | | | | | | | |
| Property Taxes | | | | | | | | | | | | | |
| Misc | | | | | | | | | | | | | |
| **Sub-total Operating Costs** | - | - | 140,602 | 107,225 | 121,025 | 112,225 | 121,025 | 148,011 | 121,025 | 107,225 | 121,025 | 148,011 | 121,025 |
| **Filing Fees & Expenses:** | | | | | | | | | | | | | |
| Legal - Bilzin, Kasowitz | | | | | | | | | | | 175,000 | | |
| US Trustee | | | | | | | 6,750 | | | | | | |
| Financial Advisor - Algon | | | - | | - | 36,000 | - | - | - | - | 40,000 | - | - |
| **sub-total** | - | - | - | - | - | 36,000 | 6,750 | - | - | - | 215,000 | - | - |
| **Beginning Cash Balance 8-18-09** | 20,041 | | | | | | | | | | | | |
| **Total Disbursements** | - | - | 140,602 | 107,225 | 121,025 | 148,225 | 127,775 | 148,011 | 121,025 | 107,225 | 336,025 | 148,011 | 121,025 |
| Change in Cash | - | - | 13,041 | 4,956 | 3,975 | 1,775 | (2,775) | (3,223) | 7,301 | (7,225) | (11,025) | 12,922 | (1,554) |
| **Operating Cash Balance** | 20,041 | 20,041 | 33,082 | 38,039 | 42,014 | 43,789 | 41,015 | 37,792 | 45,093 | 37,868 | 26,844 | 39,765 | 38,211 |