UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Miami Division
www.flsb.uscourts.gov

In re

Cabi Downtown, LLC,                                Case No. 09-27168-LMI
                                                   Chapter: 11

      Debtor.
_____/

**EMERGENCY MOTION OF BANK OF AMERICA, N.A.,
AS ADMINISTRATIVE AGENT, FOR AN ORDER PROHIBITING
THE DEBTOR FROM ENTERING INTO FURTHER RESIDENTIAL LEASES**

**Emergency Hearing Requested Pursuant to Local Rule 9075-1**

> Bank of America, N.A. requests that an emergency hearing be held on February 4, 2010 at 1:30 p.m. to consider this Motion for an Order prohibiting the Debtor from continuing to enter into residential leases. The leasing of units at the average rate of one per day has already damaged the value of the lenders' collateral and continued leasing will result in substantial harm.

Bank of America, N.A. as administrative agent ("Bank of America") for itself and the other prepetition secured lenders ("Lenders") under that certain Construction Loan Agreement (defined below), by and through undersigned counsel, moves the Court for an order directing debtor Cabi Downtown, LLC (the "Debtor") prohibiting the Debtor from entering into any new leases for residential condominium units at Everglades on the Bay. In support of this Motion, Bank of America states as follows:

**JURISDICTION AND VENUE**

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the

Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested herein is sections 105 and 363 of title 11 of the United States Code.

## SUMMARY OF MOTION

2. The Debtor owes the Lenders more than $205 million. The Lenders' claims are secured by the property and the high-rise condominium project constructed thereon, known as Everglades on the Bay ("EOTB"). The Lenders' claims, however, are substantially undersecured, and the Debtor has no unencumbered assets with which to provide adequate protection to the Lenders to offset any diminution in EOTB's value. Pursuant to this Court's prior Orders, the Debtor has been using the cash collateral generated from the leasing of the residential and retail units at EOTB to operate the Debtor's business.

3. The Debtor, however, has never sought this Court's approval of its residential leasing program, and Bank of America has learned that the Debtor is not complying with its published guidelines for qualifying individuals to be tenants. As explained in the accompanying Declaration of Greg Ward dated January 29, 2010 (the "Ward Decl."), the Debtor's leasing records established that the Debtor is conducting its leasing program in a commercially unreasonable manner. The Debtor is aggressively rushing to lease residential units to generate revenue to use as cash collateral without any regard to an individual's qualifications. As a result, instead of preserving the value of the Lenders' collateral, the Debtor is jeopardizing, if not impairing, that value. Since the Debtor has no other means to provide the Lenders with adequate protection, Bank of America requests that the Court immediately prohibit the Debtor from entering into any additional leases for residential units.

**BACKGROUND**

A. **The Debtor**

4. The Debtor, a Florida limited liability company, is a single purpose entity that owns EOTB. That project, which is near completion, was developed with approximately $241 million in loans advanced by the Lenders pursuant to a Construction Loan Agreement dated as of November 18, 2005, as thereafter amended. As noted above, EOTB and the proceeds thereof are pledged to the Lenders as collateral for the Debtor's obligations.

B. **Bank of America's Motion to Dismiss the Bankruptcy Case**

5. On September 14, 2009, Bank of America filed its Motion Pursuant to 11 U.S.C. §§ 1112(b), 362(d), 361 and 363, For an Order Dismissing the Bankruptcy Case, Or, in the Alternative, Granting Relief From the Automatic Stay and Adequate Protection (the "Motion to Dismiss"). The Court held an evidentiary hearing concerning the Motion to Dismiss, which was concluded on January 7, 2010. The Motion to Dismiss is presently *sub judice*.

C. **The Debtor's Leasing Program**

6. During the middle of 2009, when the Debtor was unable to sell units at EOTB, it began to lease units in connection with its so-called deferred purchase program. That leasing program has continued throughout the pendency of this proceeding, and the Debtor has leased, as of January 10, 2010, 244 units at EOTB.

7. The Debtor adopted criteria and guidelines to be employed in connection with its program of leasing of the units. Those criteria and guidelines were embodied in a document entitled "General Operating Guidelines for the Deferred Purchase Program" (the "Guidelines"). At the December 18, 2009 hearing on the Motion to Dismiss, the Debtor's Chief Financial and

Administrative Officer Santiago Pique testified that the Guidelines are "the operating criteria."[1] 12/18/09 Hearing Tr. at 443; *see id..* at 469 (Q: With respect to new purchasers, if I walked in off the street today and I wanted to participate in the deferred purchase program, my credit score would be evaluated, and you would try to plug it into this matrix to decide what to do, right? A: Correct). A copy of the Guidelines is submitted with this Motion as Exhibit B to the Ward Declaration.

8. The Guidelines distinguish between two categories of potential tenants. The first category consists of pre-existing unit purchasers who chose not to close on their units, and the second category consists of "potential new buyers that want to live in the unit, lease the unit, and have the option to purchase the unit." 12/18/09 Hearing Tr. at 442. This Motion concerns the leasing of units to the second category of potential tenants.

9. The Guidelines require that, as a condition of applying for a lease, individuals must consent to a credit and background check. Ward Decl., Ex. B. The Guidelines also provide that, if an applicant has a credit score below 599, the application to lease a unit will be denied. *Id.* The Guidelines further provide that, if an individual has a credit score between 600 and 620, he or she must provide first month's rent, last month's rent, a security deposit equivalent to two month's rent and a personal guarantee. *Id.* For an individual with a credit score between 621 and 649, he or she must provide first month's rent, last month's rent, a security deposit equivalent to one month's rent and a personal guarantee. *Id.* For an individual with a credit score between 650 and 699, he or she must provide first month's rent, last month's rent and a security deposit equivalent to one month's rent. *Id.* The primary purpose of the credit check is, "to make sure they can meet the lease payment obligation." 12/18/09 Hearing Tr. at 470.

---

[1] The Debtor introduced the Guidelines into evidence at the December 18 hearing as Exhibit P. 12/18/09 Hearing Tr. at 442.

**D.    The Debtor's Operation of Its Leasing Program Has Damaged the Lenders' Collateral**

10.    The Debtor's leasing program has been the Debtor's primary source of revenue during the course of these proceedings. However, as set forth below and in the accompanying Ward Declaration, the Debtor's operation of that leasing program, which is contrary to the representations that the Debtor made to both the Lenders and the Court, has damaged the value of EOTB and amounts to waste.[2]

11.    The Lenders have been concerned about the operation of the leasing program and the effect that the program is having on the value of their collateral. To assist the Lenders' evaluation of the effect of the leasing program on EOTB's value, Bank of America retained Atlantic & Pacific Advisory Services, Inc ("A&P"), a property management and development company. Ward Decl. ¶ 1. Bank of America specifically asked A&P to review all of the leasing files for all of the 244 units that the Debtor has leased. *Id.* ¶¶ 3-5.

12.    On January 13 and 14, 2010, A&P reviewed 233 of the Debtor's lease files.[3] Ward Decl. ¶ 5. A&P reviewed the files with a particular focus on the Debtor's practices and performance with respect to the leasing of units. *Id.* ¶ 3.

13.    A&P's conclusions regarding the Debtor's practices and performance is set forth in the accompanying Ward Declaration. A&P concluded, based on its professional experience and its review of the Debtor's lease files, that:

---

[2]    Although it is not a basis of this Motion, Bank of America notes and repeats its concern expressed during the Motion to Dismiss hearings that the Debtor's leasing program and its plan to lease approximately ¾ of EOTB are also detrimental and impair the value of the Lenders' collateral. Specifically, the leasing program will cause the project not to be eligible for FNMA treatment, which will materially impair the ability of the owner of EOTB in the future to sell the units. See 12/30/09 Hearing Tr. at 609-12, 625; see 12/18/09 Hearing Tr. at 414-16.

[3]    When A&P reviewed the files at the Debtor's management offices, the Debtor did not have lease files for 11 of the units that it had rented. Ward Decl. ¶ 5.

(a) The Debtor has not employed a consistent methodology when approving applications by individuals to lease units. The Debtor has leased 49 units to individuals for whom there is no background or credit check, not even a verification of employment and income. Ward Decl. ¶¶ 7-11.

(b) The Debtor has not adhered to the criteria that, as it advised the Court in Mr. Pique's December 18 sworn testimony, it purportedly applied with respect to evaluating the creditworthiness of applicants to lease units. Ward Decl. ¶¶ 6-7; *see* 12/18/09 Hearing Tr. at 442-43. Despite the evidence that the Debtor submitted to the Court on December 18, 2009, which stated that the Debtor would reject applications from individuals who had a credit score below 599, Ward Decl., Ex. B, the Debtor entered into leases with 42 individuals whose credit scores were below that number. *Id.* ¶ 13. Further, with respect to the those individuals as well as individuals with credit scores in the 600s, the Debtor has not complied with the Guidelines' requirements for security deposits, about which it also provided evidence to the Court at the December 18, 2009 hearing. The Debtor obtained insufficient security deposits (as compared to the amounts required in the Guidelines) from 8 individuals who had credit scores between 600 and 620, and did not obtain last-month rent payments from 33 tenants who had credit scores below 600 and 57 tenants with credit scores between 620 and 700. *Id.* ¶ 14.

(c) The Debtor has failed to act on and has ignored adverse results obtained from background checks about applicants to lease units. For instance, the Debtor has leased units to nine individuals who had records of criminal convictions, including grand theft, forgery and other crimes. Ward Decl. ¶ 16.

(d) The Debtor has leased units below the $1.50 per square foot that Mr. Pique advised the Court during this December 18, 2009 sworn testimony was the amount of

the rent charged by the Debtor. Ward Decl. ¶ 18; *see* 12/18 Hearing Tr. at 475. The Debtor has granted 177 leases for rents below that amount, and 15 leases for rents below $1.20 per square foot. Ward Decl. ¶ 18. In addition, the Debtor has operated a "Friends and Family" program, whereunder it has rented units at substantial discounts to individuals who are purportedly employees of the Debtor (which program has never been disclosed to the Lenders or the Court). *Id.* ¶ 19.

(e)    The Debtor has leased units to individuals with a demographic profile that is not consistent with the profile for a luxury condominium project, which is how the Debtor promotes EOTB. Ward Decl. ¶ 20. The Debtor has leased units to individuals so that units are occupied by numerous individuals, in a quasi-dorm like manner. *Id.* ¶¶ 21-22. In that regard, the Debtor has rented units to numerous students, whose conduct since renting units has been unacceptable. *Id.* The Debtor has permitted tenants to sublease their units, despite the prohibition against subleasing set forth in the form lease that the Debtor has tenants sign. *Id.* ¶ 23.

## EMERGENCY RELIEF REQUESTED

14.    Bank of America respectfully requests that this Court conduct a hearing on this Emergency Motion on February 4, 2010 at 1:30 p.m.[4] and issue an order prohibiting the Debtor from entering into any new leases of residential condominium units at EOTB.

15.    The Debtor's operation of its leasing program has damaged the value of the property and the Lenders' collateral. Under the leasing program, the Debtor is on average leasing one unit per day. If this leasing rate continues, it will result in substantial harm to the value of the property and to the Lender's collateral, and thus emergency relief is necessary.

---

[4] The Court already has a number of matters relating to the Debtor scheduled for hearing on February 4, 2010 at 1:30 p.m.

16. The Lenders have expressed their concern to the Debtor on numerous occasions about the leasing program, including requests for additional information and restrictions to the program. Yet, the Debtor has failed to make any meaningful changes to the program or consult with the Lenders in connection with the lease approval process. Thus, this appears to be the type of issue that cannot be resolved without the help of the Court.

## ARGUMENT

### A. This Court is Empowered to Prohibit the Debtor From Entering into Further Leases under its Leasing Program

17. Section 363(e) of the Bankruptcy Code establishes that, "at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Thus, "[a]t the secured creditor's insistence, the bankruptcy court must place such limits or conditions on the trustee's power to sell, use, or lease property as are necessary to protect the creditor. *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 203 (1983). Indeed, "adequate protection is recognized as a fundamental right afforded secured creditors in bankruptcy proceedings." *In re Waste Conversion Technology, Inc.*, 205 B.R. 1004, 1007 (D. Conn. 1997).

18. Moreover, Section 105 of the Bankruptcy Code gives bankruptcy courts the power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," 11 U.S.C. § 105, and enhances the power granted under section 363(e). *Matter of Friedman's, Inc.*, 336 B.R. 880, 882 (S.D. Georgia 2005) (citing *United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986).

19. For example, in *Matter of Tampa Drydock Co.,* 49 B.R. 154 (Bkrtcy M.D. Fla 1985), the debtors sought an injunction to prevent their insurance company from canceling

various policies. The policies at issue were property of the bankruptcy estate. *Id.* at 157. The court determined that it had the authority to enjoin the insurance company pursuant to several different provisions of the Bankruptcy Code.[5] *Id.* at 157. In relevant part, the court held that it had authority to grant that relief under section 363(e). *Id.* The court also held that, "[i]n addition, pursuant to § 105 of the Code, this Court has the power to enter such orders as are necessary to carry out the provisions of Title 11 and thus to enjoin INA from cancelling the policies which are the subject of these actions. *Id.*

20. Thus, the combination of sections 363(e) and 105 grants a bankruptcy court broad equitable power to ensure that parties with a security interest in assets of the bankruptcy estate are adequately protected. This Court should exercise that authority here.

**B. The Debtor Must Be Prohibited From Entering into New Leases under its Leasing Program in Order to Adequately Protect the Lenders' Collateral**

21. Section 363(p)(1) of the Bankruptcy Code places the burden of proving adequate protection on the Debtor. 11 U.S.C. § 363(p)(1). In *Friedman's*, the debtors objected on procedural and substantive grounds to the court entertaining requests for adequate protection, but the court nevertheless held that the issue was ripe for adjudication because the record established that the issue of adequate protection had been raised and that the debtor had the burden of proving adequate protection. 336 B.R. at 883.

22. As established during the hearing on the Motion to Dismiss, the Lenders are undersecured, and the Debtor has an obligation to provide adequate protection. Further, during the hearings on the Motion to Dismiss, Bank of America adduced evidence showing that the Debtor's leasing program had a detrimental effect on the ability of the owner of EOTB to be able

---

[5] The court held that the policies were covered by the version of 11 U.S.C. § 363(l) then in effect, which permitted the trustee to use, sell or lease property notwithstanding any provision in a contract conditioned on the insolvency or financial condition of the debtor.

to sell units if the vast majority of the units are first leased.  Now, in the evidence set forth in the Ward Declaration, Bank of America has come forward with substantial evidence that the leasing program does not provide adequate protection, but that the program is, in fact, both hurting the financial condition of the Debtor as well as materially impairing the value of the Lenders' collateral.  The Debtor cannot establish, given this record, that the continuation of the leasing program would provide the Lenders with adequate protection.  Since the Debtor cannot provide any justification for continuation of the program, given the program's performance to date, that program must be stopped.

23. In circumstances such as those present here, the courts limit a debtor's operational authority to the extent necessary to provide adequate protection to the creditor.  *See First Federal Savings & Loan Association v. Standard Building Associates, Ltd. (In re Standard Building Associates, Ltd.)*, 85 B.R. 644 (Bankr. N.D. Ga. 1988) (prohibiting debtor from leasing any further space based on evidence that it was leasing at below market rates and failing to address problems of past due rents).  Adequate protection is clearly absent when a debtor's mismanagement diminishes the value of the real property that is a secured creditor's collateral. *See In re New Era Co.*, 125 B.R. 725 (S.D.N.Y. 1991) (adequate protection lacking where debtor's neglect and mismanagement of real property "created a real risk" to the creditor's interest); *see also In re 160 Bleecker St. Associates*, 156 B.R. 405 (S.D.N.Y. 1993) (adequate protection lacking when the debtor's maintenance defaults increased its liabilities for real estate taxes, fire alarm repairs and unpaid water and sewer charges).

24. Here, Bank of America has demonstrated that the Debtor's leasing program impairs the Lenders' collateral.  The value of the Lenders' collateral, EOTB, has been materially impaired as a result of the Debtor's failure to comply with the Guidelines, which  it has

represented to the Court under oath govern the decision to rent a unit, and the tenants who consequently have been able to lease the units. And if the leasing program is not stopped, that injury will only worsen. Given these facts, the Debtor cannot meet its burden of proving that the Lenders are adequately protected. Thus, based on the adequate protection requirement mandated in section 363(e), the Debtor's free rein to diminish the Lenders' collateral through the leasing program must end.

**WHEREFORE**, Bank of America requests that this Court issue an order prohibiting the Debtor from entering into any new leases for residential units at Everglades on the Bay.

**I HEREBY CERTIFY** that the undersigned attorney is appearing *pro hac vice* in this matter pursuant to Court Order dated November 11, 2009.

>     KAYE SCHOLER LLP
>     By:    /s/ *H. Peter Haveles, Jr.*
>                 Ana M. Alfonso
>                 NY Attorney Registration No. 2915080
>                 H. Peter Haveles, Jr.
>                 425 Park Avenue
>                 New York, NY 10022
>                 Telephone: 212-836-8000
>                 Facsimile: 212-836-8689
>                 aalfonso@kayescholer.com
>                 peter.haveles@kayescholer.com

**I HEREBY CERTIFY** that the undersigned attorney is appearing *pro hac vice* in this matter pursuant to Court Order dated August 26, 2009.

>     SHUTTS & BOWEN LLP
>     By:    /s/ *Larry I. Glick*
>                 Larry I. Glick
>                 NY Attorney Registration No. 1728385
>                 201 South Biscayne Boulevard
>                 1500 Miami Center
>                 Miami, Florida 33131
>                 Telephone: 305-358-6300
>                 Facsimile: 305-347-7877
>                 lglick@shutts.com

*Attorneys for Bank of America, N.A., as Administrative Agent for itself and other secured Lenders*